**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| W. STEVE SMITH, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-1779 |
| | § | |
| AMERICAN FOUNDERS FINANCIAL, | § | |
| CORP., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

Plaintiff W. Steve Smith, is the Chapter 7 bankruptcy trustee of the estates of IFS
Financial Corp. ("IFS"), Circle Investors, Inc. ("Circle"), IFS Insurance Holdings, Inc.
("Insurance Holdings"), and Comstar Mortgage Corp. ("Comstar").  He has sued American
Founders Financial Corp. ("AFFC") and Vesta Fire Insurance Corp. ("Vesta") under the
Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COM. CODE § 24.001, *et seq.*,
("TUFTA").[1]  Smith challenges transactions that occurred after AFFC's 1999 merger with
Securus Financial Corporation ("Securus")—one of a number of IFS's indirect
subsidiaries—and dealings among AFFC, IFS, and other entities related to IFS.

Both sides have filed numerous motions in this case.  This memorandum and opinion
addresses Smith's partial summary judgment motion that addresses reasonably equivalent
value, (Docket Entry No. 24), and the overlapping portions of AFFC's partial summary

---

[1] Smith dismissed with prejudice all claims against Vesta.  (Docket Entry No. 121).

judgment motion, (Docket Entry No. 73).  This memorandum and opinion also addresses Smith's first amended motion for leave to file an amended complaint.  (Docket Entry No. 50).  Other issues raised in the parties' pending motions will be separately addressed.

Based on the pleadings, the motions, responses, replies, and surreplies, the record, and the applicable law, this court denies Smith's partial summary judgment motion on reasonably equivalent value, grants the corresponding portions of AFFC's partial summary judgment motion, and grants in part and denies in part Smith's first amended motion for leave to file an amended complaint.  The reasons for these rulings are explained below.

## I.    Background

Smith is the trustee for four separate bankruptcy estates:  IFS, Insurance Holdings, Circle, and Comstar.   In this suit, Smith complains of numerous transfers.   This memorandum and opinion discusses only those transfers that bear on the summary judgment motions on reasonably equivalent value.

Interamericas Financial Holdings Corp. ("Interamericas") is currently the corporate parent and 59% owner of IFS.  (Docket Entry No. 11, ¶ 12).  IFS is a holding company controlled by Hugo Pimienta.  Through a number of subsidiaries, IFS engaged in mortgage banking and insurance activities.  In mid-1999, Bradford National Life Insurance Company ("Bradford"), a Louisiana insurance company owned by Insurance Holdings, an IFS subsidiary, merged into American Founders Life Insurance Company ("AFL").  (Docket Entry No. 73, Ex. B at 2).  Kenneth Wayne Phillips, the former Bradford chairman and CEO

and Insurance Holdings director, described in his affidavit the corporate structure of IFS and its insurance-related affiliates before the merger of Bradford and AFL.  Bradford and AFL were indirect, wholly-owned subsidiaries of Securus, which was a wholly-owned subsidiary of Circle, which was a wholly-owned subsidiary of Insurance Holdings, which was a wholly-owned subsidiary of IFS; Securus, Circle, Insurance Holdings, and other related companies (the "IFS Group") were all ultimately owned by IFS.  Hugo Pimienta held a controlling interest in IFS and served as its chairman and CEO.  (Docket Entry No. 73, Ex. B at 1–3).  Interamericas also held a significant interest in IFS.  (*Id.* at 2).

After the merger of Bradford into AFL in mid-1999, AFL was a wholly-owned subsidiary of Laurel Life Insurance Company, a wholly-owned subsidiary of Securus, which continued to be wholly owned by Circle.  (Docket Entry No. 73, Ex. B at 2).  Circle remained a wholly-owned subsidiary of Insurance Holdings, which remained a wholly-owned subsidiary of IFS.  (*Id.*).  The only aspect of the corporate relationship that changed was that Bradford merged into AFL.

In 1998 and 1999, Bradford and AFL made a series of loans totaling $41,750,000 to individuals and companies (the "Select Asset Loans").  (Docket Entry No. 73, Ex. B at 3).  Five of the loans were made to corporations that pledged stock in companies owning real estate in Mexico. Three loans were made to Mexican nationals and secured by stock in IFS.  (*Id.* at 4).  Phillips testified in his affidavit that Bradford and AFL made these loans at Pimienta's recommendation.  (*Id.* at 3).  Phillips and Wayne Allen Schreck, the former

president and CEO of Laurel and former senior vice-president of AFL, stated in their affidavits that they were not aware of questions about the value or security of the Select Asset Loans until late 2001.  (Docket Entry No. 73, Ex. B; Docket Entry No. 78, Ex. B). AFFC concedes that "[i]t now appears that the Select Asset Loan proceeds were diverted for use by IFS and the borrowers were given investment credit in IFS or one of IFS's parent companies in exchange for their cooperation."  (Docket Entry No. 78 at 8).  Smith contends that Schreck and Phillips were aware that IFS—not the borrowers—was making the payments on the Select Asset Loans proceeds during the relevant period.  (Docket Entry No. 1, ¶ 23).

On April 12, 1999, Schreck and Phillips formed AFFC as a vehicle for purchasing the operating companies of Insurance Holdings.  (Docket Entry No. 73, Ex. B at 6).  AFL was merged into AFFC on January 31, 2000, under a merger agreement between AFFC and Circle and IFS on September 17, 1999.  (Docket Entry No. 73, Ex. B at 4).  Schreck and Phillips stated that the merger was entered into after "several months of intense arms' length negotiations with Mr. Pimienta" and after meeting with several potential buyers, none of whom were interested in including the Select Asset Loans in the assets to be acquired. (Docket Entry No. 73, Ex. B at 6; Docket Entry No. 78, Ex. B at 3–4).  "Because AFFC did not have the relationship with the borrowers or the various Mexican contacts that would be related to collection and enforcement, AFFC was not willing to assume the sole risk of the Select Asset Loans."  (Docket Entry No. 78 at 11).  AFFC instead created a preferred stock

structure in the merger that gave IFS and Circle incentives to continue to facilitate payment of the Select Asset Loans and that protected AFL and AFFC by allowing them to offset the Select Asset Loans against the preferred stock.  Phillips explained the preferred stock structure in his affidavit, as follows:

> The structure established in the Merger Agreement provided for the issuance by AFFC of Series A Preferred Stock to Circle, w[ith] preferential dividend, distribution and redemption features, which, however, could be paid either in cash or at AFFC's election, by assignments of interests in the Select Asset Loans, valued at the face amount of principal and accrued interest.

(Docket Entry No. 73, Ex. B at 8).

On the merger date, AFL paid Securus total dividends and distributions totaling $49.5 million.  Securus then paid the dividends and distributions to Circle, less agreed adjustments. (Docket Entry No. 73, Ex. B at 9).  AFFC issued Circle 50,000 shares of Series A Preferred Stock with a stated value of $1,000 per share and 50,000 Warrants.  The Warrants allowed Circle under certain conditions to convert each share of the Series A Stock into AFFC common stock.  (*Id.*).  In exchange, AFFC received all of the issued stock of Securus and its subsidiaries, including AFL.  (*Id.* at 7).  From the purchase proceeds, AFL retained $2,245,136.60 owing on the Select Asset Loans; $2,388,976.33 required to reduce the balance on the Luis Mendez Jimenez loan—one of the Select Asset Loans—to meet collateral-to-loan ratios required by the Texas Department of Insurance (TDI); and an offset of $325,132.39 to pay a receivable that Bradford Brokerage, Inc., an IFS and Insurance Holdings affiliate, owed AFL.  (*Id.*).  Bradford Brokerage, which is distinct from Bradford

National Life Insurance Company, was not among the subsidiaries that AFFC acquired in the merger.  (Docket Entry No. 53, Ex. F).

On May 23, 2000, Circle, IFS, and AFFC entered into a redemption agreement for Circle's 50,000 shares of Series A Preferred Stock and Warrants (the "Series A Redemption"), allegedly at Pimienta's request.  (Docket Entry No. 78, Ex. F).  The Series A Redemption did not close until the end of June 2000.  AFFC paid Circle $22 million and issued Circle 30,000 shares of Series C Preferred Stock.  (*Id.*).  The Series C stock was "redeemable in whole at any time or in part from time to time at the option of [AFFC], at its Stated Value plus accrued but unpaid dividends, in cash, in Selected Assets . . . or by set-off of Selected Asset Loss Claims or Merger Indemnity Claims, at the election of [AFFC]." (Docket Entry No. 78, Ex. I, ¶ 5(a)).  AFFC argues that, "[t]hrough these terms, the Series C Stock served as new collateral to provide security to AFFC for the performance of the Select Asset Loans."  (Docket Entry No. 78 at 16).  Circle also gave AFFC a security interest in the Series C Stock.  (Docket Entry No. 78, Ex. G).  Phillips testified that AFFC maintained physical possession of the Series C Stock certificates as security for the Select Asset Loans.  (Docket Entry No. 73, Ex. B at 13).

In May 2000, AFFC also made a $5.5 million loan to Comstar (the "Comstar Loan"),[2] another IFS subsidiary, again allegedly at Pimienta's request.  (Docket Entry No. 73, Ex. B at 13–14; Docket Entry No. 73, Ex. N).  Phillips testified that Pimienta wanted to obtain a

---

[2]AccuBanc changed its name to Comstar in December 1999.  Some parts of the record refer to the company as AccuBanc.

short-term loan for IFS in the amount of $5 million until the closing of the Series A

Redemption in June 2000.  (Docket Entry No. 73, Ex. B at 13).  For this Loan, Comstar

pledged its receivables, which were ultimately owing to IFS.  (*Id.*).  AFFC put several

conditions on the Loan, including that AFFC would withhold $507,561.63 from the loan

proceeds paid to Comstar to pay off a nonperforming debt Bradford Brokerage owed AFL

(the "Bradford Receivable No. 2").  (Docket Entry No. 24 at 4; Docket Entry No. 53 at 4–5).

The parties agreed that the Comstar Loan would be paid in full at the Series A Redemption

closing in June 2000.  (Docket Entry No. 73, Ex. N).  In an email to Pimienta on May 15,

2000, Schreck wrote:

> The actual closing of the preferred stock redemption agreement (and the
> redemption of the Series A Preferred Stock) will be subject to AFFC reaching
> acceptable arrangements for obtaining the financing necessary for the
> preferred stock redemption.  If we are successful in securing this financing
> from the potential new investor then the $5 million loan to AccuBank
> [Comstar] will be repaid at the closing of the preferred stock redemption.  If
> the preferred stock redemption financing does not come through as anticipated
> then the $5 million loan to AccuBank [Comstar] will be repaid as outlined in
> the attached term sheet.

(Docket Entry No. 24, Ex. 1).  Pimienta testified that the Comstar Loan proceeds were paid

to other IFS entities.  (Docket Entry No. 73, Ex. M at 38–39, 158–59).  Pimienta explained:

> Comstar did not need [the money].  What -- who needed it was the holding
> company.  And since Comstar was in liquidation at that time, there was --
> there were no restrictions by banks or anybody else on Comstar, so those
> were assets that were at the disposal of the holding company, if you will, and
> since cash was needed, that was an asset that was acceptable for the insurance
> company to loan money against.

(Docket Entry No. 73, Ex. M at 158–59).

In May 2000, Comstar recorded an "Accts Payable AFL" in the amount of $5.5 million. (Docket Entry No. 73, Ex. F at 4). Comstar also booked an intercompany receivable from Interamericas for $5,807,561.63. (*Id.* at 2). That receivable was combined with another $500,000 receivable from Interamericas and reclassified as a receivable from IFS in the amount of $6,307,561.63. (*Id.*). At the same time, IFS recorded a credit against an $850,000 debt owed by Comstar for $507,561.63 with the reference "Pay-off Bradford Brok. debt." (Docket Entry No. 73, Ex. G at 4). IFS also recorded a credit against Comstar's account for $5,780,000. (*Id.*). The IFS ledger for May 2000 also shows an entry for an intercompany receivable from Bradford Brokerage, Inc. for $507,561.63 with the reference "Pay-off Bradford Brok. debt." (*Id.*). Bradford Brokerage, Inc. recorded a similar intercompany payable to IFS on June 30, 2000 for $507,561.63 with the reference "to record pay-off Brad Brok." (Docket Entry No. 73, Ex. H).

The parties closed on the Series A Redemption on June 30, 2000. The Comstar Note was marked "paid and cancelled." (Docket Entry No. 73, Ex. N). When the Series A Redemption closed, AFFC retained out of the proceeds payable to Circle an offset for the remaining balance owed on the Comstar Loan. (Docket Entry No. 73, Ex. B at 13–14). Comstar acknowledged this transaction in its ledger by crediting its account payable to AFL. (Docket Entry No. 73, Ex. L at 12). Comstar's balance sheet no longer reflected a balance owing to AFL. Comstar also created an intercompany payable account to Insurance Holdings for $5,035,064 with the reference: "To record pyoff [sic] of loan to AFL." (*Id.*).

In September 2000, Comstar made payments to AFFC on the Select Asset Loans totaling $2,513,100. These payments were recorded in Comstar's ledger as a credit against an account receivable for AFL. (Docket Entry No. 73, Ex. S at 5). Comstar credited its intercompany account payable to Insurance Holdings in the amount of $2,513,100 at the same time. (*Id.* at 9). Insurance Holdings credited the same amount against its intercompany account receivable from Comstar in October 2000. (Docket Entry No. 73, Ex. T at 2).

IFS went into bankruptcy in August 2002. (Docket Entry No. 79, Ex. A at 264). On October 10, 2004, Smith filed the original complaint in this case. Smith filed a third amended complaint on September 2, 2005. (Docket Entry No. 11). On the same date, the parties stipulated that "AFFC will assume financial responsibility to Plaintiff for any liability that AFL may be found to owe to Plaintiff in any final, non-appealable order or judgment entered in this case that awards to Plaintiff monetary damages arising from the transactions listed in Plaintiff's 'Damage Chart,'" which was attached to the third amended complaint. (Docket Entry No. 13). This court's scheduling and docket control order, (Docket Entry No. 16), set September 2, 2005 as the deadline for Smith to amend his complaint without leave of court and set the discovery deadline as December 9, 2005. On December 16, 2005, the discovery deadline was extended to March 3, 2006 and the deadline for pretrial motions extended to March 17, 2006. (Docket Entry No. 38).

Both Smith and AFFC have moved for partial summary judgment on the issue of reasonably equivalent value. (Docket Entry Nos. 24 & 73). Smith asserts that, based on the

undisputed facts disclosed in the record and as a matter of law, Comstar did not receive reasonably equivalent value for its $507,561.63 offset on the $5.5 million Comstar Note to pay the Bradford Receivable No. 2.  (Docket Entry No. 24).  AFFC asserts that based on the record, as a matter of law, Comstar did receive reasonably equivalent value for the offset to pay the Bradford Receivable No. 2.  (Docket Entry No. 73).  AFFC also moves for summary judgment that Comstar received reasonably equivalent value on its $2,513,100 September 30, 2000 Select Asset Loan payments.  (*Id.*).

Smith moves for leave to file his fourth amended complaint.  (Docket Entry No. 50).  The proposed amended complaint would add the allegation that AFFC is estopped from taking positions inconsistent with the facts asserted in various regulatory filings.  The proposed amended complaint would also correct errors in paragraphs 20 and 36 of the third amended complaint, including a mathematical error in paragraph 20 and an error in the date of a transfer alleged in paragraph 36, which should be March 2001 rather than March 2000.  AFFC has responded, (Docket Entry No. 51); Smith has replied, (Docket Entry No. 54); and AFFC has surreplied, (Docket Entry No. 57).

Both motions are analyzed below.

## II.     The Motions Relating to Reasonably Equivalent Value

### A.     The Summary Judgment Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56.  The moving

party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005). If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics*

11

*Trafficking Task Force*, 379 F.3d 293, 304 (5th Cir. 2004).  The nonmovant must do more than show that there is some metaphysical doubt as to the material facts.  *Armstrong v. Am. Home Shield Corp.*, 333 F.3d 566, 568 (5th Cir. 2003).

Affidavits supporting or opposing summary judgment must "set forth facts that would be admissible in evidence."  FED. R. CIV. P. 56 (e); *see Love v. Nat'l Med. Enters.*, 230 F.3d 765, 776 (5th Cir. 2000).  Statements constituting hearsay are not competent summary judgment evidence.  *Okoye v. Univ. of Tex. Houston Health Sci. Ctr.*, 245 F.3d 507, 510 n.5 (5th Cir. 2001) (citing *Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995)).  Material that is inadmissible will not be considered on a summary judgment motion because it would not establish a genuine issue of material fact if offered at trial.  *See Pegram v. Honeywell, Inc.*, 361 F.3d 272, 285 (5th Cir. 2004).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party.  *Anderson*, 477 U.S. at 255; *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002).  "Rule 56 'mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (quoting *Celotex*, 477 U.S. at 322).

**B.      The Applicable Law**

A threshold issue is whether Texas or Arizona law governs the reasonably equivalent value analysis of the transactions at issue.  Smith sued AFFC under § 544(b) of the

Bankruptcy Code.  11 U.S.C. § 544(b).  Section 544(b) gives the trustee the power to avoid the debtor's transfers or obligations that are avoidable by an actual, existing unsecured creditor under authority outside the bankruptcy law.  *In re Radcliffe's Warehouse Sales, Inc.*, 31 B.R. 827, 832 (Bankr. W.D. Wash. 1983) ("Like Prometheus bound, the trustee is chained to the rights of creditors in the case under title 11.  If there are not creditors within the terms of section 544(b) against whom the transfer is voidable under applicable law, the trustee is powerless to act as far as 544(b) is concerned." (citations omitted)).  Smith has sued to avoid the transfers at issue here under the Texas Uniform Fraudulent Transfer Act ("TUFTA"), sections 24.005(a)(1), 24.005(a)(2), and 24.006(a).  The Comstar Loan documents, however, have a choice-of-law provision that specifies Arizona law.  (Docket Entry No. 73, Ex. N at 7).

Because both Texas and Arizona have adopted the Uniform Fraudulent Transfer Act in nearly identical form, a choice-of-law determination is unnecessary to resolve the motions on reasonably equivalent value.  *See* TEX. BUS. & COM. CODE § 24.001 *et seq.*; ARIZ. REV. STAT. § 44.1001 *et seq.*  The courts of both states interpret the provisions on reasonably equivalent value similarly.  *Compare In re Hinsley*, 201 F.3d 638 (5th Cir. 2000) (applying TUFTA), *with In re Viscount Air Servs., Inc.*, 232 B.R. 416 (Bankr. D. Ariz. 1998) (applying Arizona's fraudulent transfer provisions).  Because the outcome does not turn on whether Texas or Arizona law applies, this court need not choose between them.  The analysis cites the TUFTA fraudulent transfer provisions and authorities from both Texas and Arizona.

13

Federal law controls the procedural and evidentiary issues. *Herbert v. Wal-Mart Stores, Inc.*, 911 F.2d 1044, 1047 (5th Cir. 1990) (citing *Hanna v. Plumer*, 380 U.S. 460, 465 (1965)).

Section 544(b) of the bankruptcy code allows the trustee to step into the shoes of an actual creditor in existence as of the commencement of the case who may void transfers under state fraudulent conveyance acts.  11 U.S.C. § 544(b); *In re Strasser*, 303 B.R. 841, 846 (Bankr. D. Ariz. 2004).  The burden is on the trustee seeking to avoid the transfer to demonstrate the existence of an actual creditor with a viable cause of action against the debtor that is not time barred or otherwise invalid.  *In re G-I Holdings, Inc.*, 313 B.R. 612, 632–33 (Bankr. D.N.J. 2004); *In re DLC, Ltd.*, 295 B.R. 593, 602 (B.A.P. 8th Cir. 2003). Section 544(b) provides:

> (1) Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.
>
> (2) Paragraph (1) shall not apply to a transfer of a charitable contribution (as that term is defined in section 548(d)(3)) that is not covered under section 548(a)(1)(B), by reason of section 548(a)(2). Any claim by any person to recover a transferred contribution described in the preceding sentence under Federal or State law in a Federal or State court shall be preempted by the commencement of the case.

11 U.S.C. § 544(b).  The unsecured creditor need not exist at the time the action is filed.  If there are no creditors against whom the transfer is voidable under the applicable law, the trustee is powerless to act under § 544(b).  *In re DLC, Ltd.*, 295 B.R. at 601–02.  Section

14

544(b) gives the trustee "no greater rights of avoidance than the creditor would have if it were asserting invalidity on its own behalf."  5 COLLIER ON BANKRUPTCY, ¶ 544.009[3] (15th ed. rev. 2006) (citing *Heffron v. Duggins*, 115 F.2d 519 (9th Cir. 1940)).  If the creditor is "deemed estopped to recover upon a claim, or is barred from recovery because of the running of a statute of limitations prior to the commencement of the case, the trustee is likewise estopped or barred."  *Id.*

To avoid the transfers at issue under section 544(b), Smith must identify an existing unsecured creditor with an allowable claim who could avoid the transfers under Texas or Arizona fraudulent transfer law.  Fraudulent transfers are subdivided into two categories: actually fraudulent transfers, TEX. BUS. & COM. CODE § 24.005(a)(1); and constructively fraudulent transfers, TEX. BUS. & COM. CODE §§ 24.005(a)(2) & 24.006(a).  Section 24.005(a) provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made or the obligation was incurred, if the debtor made the transfer or incurred the obligation under any of the following:
>
> (1)  With actual intent to hinder, delay or defraud any creditor of the debtor.
>
> (2)  Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:
>
>> (a)  Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the

              business or transaction.

      (b)     Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

TEX. BUS. & COM. CODE § 24.005(a).  Section 24.006(a) provides:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

TEX. BUS. & COM. CODE § 24.006(a).

Reasonably equivalent value is an element of the plaintiff's claim under both §§ 24.005(a)(2) and 24.006(a).  Under section 24.005(a)(1), reasonably equivalent value is a factor courts may use to find actual intent, TEX. BUS. & COM. CODE § 24.005(b)(8), and is an element of the defendant's good-faith defense, *Id.* § 24.009(a).

> Value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or an antecedent debt is secured or satisfied, but value does not include an unperformed promise to furnish support to the debtor or another person unless the promise is made in the ordinary course of the promisor's business.

TEX. BUS. & COM. CODE § 24.004(a).  "'Reasonably equivalent value' includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets at an arm's length transaction."  *Id.* § 24.004(d).  Texas and

16

Arizona courts look to both state and federal law for guidance in construing the phrase "reasonably equivalent value." *In re Hinsley*, 201 F.3d at 643 (applying TUFTA and looking to cases under 11 U.S.C. § 548(a)(2)); *In re Viscount Air Servs., Inc.*, 232 B.R. at 434 (applying Arizona's fraudulent transfer statute and looking to cases interpreting 11 U.S.C. § 548(a)(2)).   Value is determined as of the date of the transfer in question. *Mladenka v. Mladenka*, 130 S.W.3d 397, 407 (Tex. Ct. App.—Houston [14 Dist.] 2004, no pet.); *In re Viscount Air Servs., Inc.*, 232 B.R. at 435.  In determining value, a court should examine all aspects of a transaction and both direct and indirect burdens to the debtor.  *In re Newtowne, Inc.*, 157 B.R. 374, 378–79 (Bankr. S.D. Ohio 1993).  The determination is made from the creditor's point of view; the issue is whether, from the creditor's standpoint, the estate lost value.  *Nat'l Loan Investors, L.P. v. Robinson*, 98 S.W.3d 781, 784 (Tex. Ct. App.—Amarillo 2003, pet. denied); *In re Prejean*, 994 F.2d 706, 708–09 (9th Cir. 1993). Courts examine all the circumstances surrounding a transaction, looking to whether there is a reasonable and fair proportion between what the debtor surrendered and what the debtor received in return.  *Zellerbach Paper Co. v. Valley Nat'l Bank*, 477 P.2d 550, 555 (Ariz. Ct. App. 1970) (applying the UFTA's predecessor, the Uniform Fraudulent Conveyance Act: "[A]n answer to what is a fair consideration is not found solely by a determination of the thing sold and the price received in precise scales, but all circumstances considered there should be a reasonable and fair proportion between the one and the other.").  "The proper focus is on the net effect of the transfers on the debtor's estate, the funds available to the

unsecured creditors." *In re Viscount Air Servs., Inc.*, 232 B.R. at 435; *In re Hinsley*, 201 F.3d at 644.

### C.    The Objections to the Summary Judgment Evidence

In his reply to AFFC's response to partial summary judgment, Smith objects to AFFC's use of Comstar, IFS, and Bradford's financial records.  (Docket Entry No. 56 at 3). AFFC supplied an affidavit of the records custodian, Stephanie Sawyer, in its surreply. Sawyer's affidavit cures the deficiencies that were the basis of the objection.  FED. R. EVID. 803(6); *United States v. Box*, 50 F.3d 345, 355–56 (5th Cir. 1995) ("The trial court has broad discretion to determine the admissibility of the documents. . . . A qualified witness is one who can explain the system of record keeping and vouch that the requirements of Rule 803(6) are met; the witness need not have personal knowledge of the record keeping practice or the circumstances under which the objected to records were kept.").  Smith's objection is overruled.

Smith also objects to AFFC's use of an unpublished opinion as summary judgment evidence, which AFFC attached to its response to summary judgment.  This court's procedures—which predate electronic case research capabilities—require counsel to attach copies of unpublished authorities to briefs that refer to such authorities.  As of January 1, 1996, Fifth Circuit unpublished opinions are no longer precedent, but may be cited as persuasive authority.  5th Cir. L.R. 47.5.4 ("Unpublished opinions issued on or after January 1, 1996, are not precedent, except under the doctrine of res judicata, collateral estoppel or

18

law of the case (or similarly to show double jeopardy, abuse of the writ, notice, sanctionable conduct, entitlement to attorney's fees, or the like).  An unpublished opinion may, however, be persuasive.  An unpublished opinion may be cited, but if cited in any document being submitted to the court, a copy of the unpublished opinion must be attached to each document.").  Smith's objection is overruled.

### D.    Analysis

Smith argues that neither Comstar, Circle, nor IFS had an obligation to pay the Bradford Brokerage debt.  Smith argues that a transfer of an interest of the debtor to pay a third-party debt for which the debtor was not liable constitutes a fraudulent transfer.  (Docket Entry No. 24 at 8).  Smith argues that AFFC's withholding of $507,561.63 from the loan proceeds payable to Comstar to pay off AFL's debt to Bradford was fraudulent because Comstar was not indebted to Bradford.  According to Smith, Comstar received a debt worth $5.5 million in exchange for approximately $5 million in loan proceeds.

AFFC argues that Comstar received reasonably equivalent value with respect to the $507,561.63 offset on the Comstar Loan because Insurance Holdings, through its subsidiary Circle, paid the Bradford Receivable No. 2, even though the Comstar Note stated that Comstar would be responsible for this payment.  (Docket Entry No. 73, Ex. N).  While Comstar took on the $5.5 million debt and received approximately $5 million in return, Comstar's debt was subsequently extinguished and the Note was marked paid and cancelled. (*Id.*).  Comstar never paid anything on its debt.

19

Phillips testified that the Comstar Loan was made "[c]ontemporaneous with the Series A Buyback Transaction, and in contemplation thereof . . . . Mr. Pimienta stated that IFS desired to obtain a short term loan of $5 million until the closing of the Series A Buyback Transaction."  (Docket Entry No. 73, Ex. B at 13).  The Comstar Loan documents are consistent with this testimony, stating that the loan was to be paid in full at the Series A Redemption closing.  (Docket Entry No. 73, Ex. N).  Smith does not point to any evidence controverting the assertion that the Comstar Loan was a part of the larger redemption transaction.  Smith instead argues that the law requires examination of the Comstar Loan transaction independent of the other transactions.

Reasonably equivalent value is measured at the time of the transfer from the standpoint of Comstar's creditors.  *In re Viscount Air Servs., Inc.*, 232 B.R. at 435.  Taking into account Insurance Holdings's payment of the Comstar Loan in determining whether Comstar received reasonably equivalent value at the time it took on the $5.5 million debt requires this court to analyze the Comstar Loan in the context of the Series A Redemption transaction.  "The analysis is slightly more complicated when the transfer involves a third party because the benefit to the debtor may be harder to trace.  A court should examine all aspects of the transaction and burdens to the debtor, direct or indirect."  *In re Newtowne, Inc.*, 157 B.R. at 379.

The record shows that Comstar did not pay the amount it owed AFL for the Comstar Loan; Insurance Holdings paid the Loan through its subsidiary, Circle.  (Docket Entry No.

20

73, Ex. G at 4).  When the Series A Redemption closed, AFFC retained from the proceeds payable to Circle an offset for the remaining balance owed on the Comstar Loan.  (Docket Entry No. 73, Ex. B at 13–14).  The Comstar Note was marked paid and cancelled.  (Docket Entry No. 73, Ex. N).  Comstar's ledger indicates that its account payable owed to AFL was eliminated.  (Docket Entry No. 73, Ex. L at 12).  At the same time, Comstar created a new intercompany payable account to Insurance Holdings for $5,035,064 with the reference, "To record pyoff [sic] of loan to AFL."  (*Id.*).  AFFC explains that the intercompany payable to Insurance Holdings shored up Comstar's balance sheet after the Loan payment.  Comstar continued to have an intercompany receivable on its books from IFS created in May 2000 for the Comstar Loan.  Comstar closed its account payable to AFL for the Comstar Note and created the account payable to Insurance Holdings.

Smith argues that Comstar may have been recording a debt it now owed Insurance Holdings for paying off the Comstar Loan and that Comstar did not record an intercompany receivable from IFS in May for the amount of the Loan.  Smith points to a set of entries in Comstar's May books, which do not clearly indicate that IFS now owed Comstar on the Note.  Comstar's ledger shows that it combined a $5,807,561.63 receivable and a $500,000 receivable from Interamericas and reclassified those accounts as receivables owing from IFS for $6,307,561.63.  (Docket Entry No. 73, Ex. F at 2).  According to Smith, these transactions do not provide clear evidence that IFS was indebted to Comstar for the Loan amount.  Smith also argues that Comstar, not IFS, was the maker on the Note.  (Docket Entry

21

No. 73, Ex. N).   IFS's October 2000 ledger also shows that Comstar owed IFS an outstanding debt of $5,035,064.  (Docket Entry No. 73, Ex. T at 2).  Based on these facts, Smith argues that it is not clear that Comstar was relieved of its $5.5 million debt and not clear that the Comstar Loan is properly viewed as part of the Series A Redemption transaction.

AFFC also argues that Comstar received reasonably equivalent value because IFS extinguished Comstar's liability in the amount of the offset on prior debts Comstar owed IFS.  AFFC claims that when Comstar took on the $5.5 million Note in exchange for $5 million in cash, IFS credited Comstar's outstanding balance in the amount of $507,561.63—the exact amount of the offset.  Before May 2000, Comstar owed IFS $850,000.  (Docket Entry No. 73, Ex. G at 4).  In May 2000, IFS's ledger shows a credit of $507,561.63 to Comstar's balance with the notation, "Pay-off Bradford Brok. debt."  (*Id.*).  Courts hold that "[i]f, as a result of the debtor's payment of a third party's debt, a debt of the debtor to that third party is also discharged, that may be enough to establish 'reasonably equivalent value.'"  *In re Newtowne, Inc.*, 157 B.R. at 379 (citing *In re Uiterwyk Corp.*, 75 B.R. 33, 34 (Bankr. M.D. Fla. 1987)).

The case of *In re Uiterwyk Corp.* involves similar facts.  75 B.R. at 33.  The debtor, Uiterwyk Corporation, sought to recover approximately $35,000 it paid to the defendant, Maher.  Uiterwyk was an agent for two shipping companies, Egyptian Navigation Lines and Uiterwyk Lines West Africa.  Uiterwyk paid Maher to provide stevedoring services to the

shipping companies' vessels.  Uiterwyk paid Maher out of its own funds, then debited the accounts of Egyptian and West Africa in the amount paid on their behalf.  Uiterwyk would then pay its accounts with Egyptian and West Africa, less the amounts Uiterwyk had paid to Maher on their behalf.  In bankruptcy, Uiterwyk asserted that it was entitled to avoid several of these transactions to Maher because it did not receive reasonably equivalent value: "[I]nasmuch as the debt it paid was the debt of a third party, the consideration for this payment, the discharge of the debt, flowed not to the Debtor but to the third party."  *Id.* at 34.  The court held that while it was clear that Egyptian and West Africa received the benefit of Maher's stevedoring services, Uiterwyk had also received a benefit in having its debt to third-parties adjusted.  "[A] Debtor's discharge of a third party's debt which also discharges its own debt to that third party is sufficient to establish equivalent value . . . ."  *Id.*

*In re Gerdes* similarly held that avoiding a liability was reasonably equivalent value for a transfer made on a third-party's behalf.  *In re Gerdes*, 246 B.R. 311, 314–15 (Bankr. S.D. Ohio 2000).  The debtor, Patricia Gerdes, paid $8500 to Center Motors to clear title to a car she had sold to a third party.  As the president and sole shareholder of Center Motors, Gerdes would have been personally liable to the third party had the title remained encumbered.  The court held that the avoidance of this personal liability was reasonably equivalent value for the $8500 payment.  *Id.*

Smith points to nothing in the record to contradict the evidence that Comstar received a direct benefit in the crediting of its account by the same dollar amount offset by the

Comstar Note.  None of Smith's experts in this case offer an opinion on whether Comstar received reasonably equivalent value.  A debtor cannot avoid a transfer made for the benefit of a third party when the debtor receives a credit against debts it owes to that third party.  *In re Gerdes*, 246 B.R. at 314–15; *In re Uiterwyk*, 75 B.R. at 34.  Comstar's offset of $507,561.63 was for the benefit of its sister company, Bradford Brokerage, which owed AFL for the Bradford Receivable No. 2.  Comstar's parent, IFS, subsequently discounted Comstar's indebtedness to it by the same amount.  Comstar received reasonably equivalent value in return for the $507,561.63 offset of the Comstar Note.  Smith's first partial summary judgment motion is denied.  AFFC's partial summary judgment motion as to reasonably equivalent value is granted as to the Bradford Receivable No. 2 offset.

AFFC also moves for summary judgment as to Comstar's $2,513,100 September 30, 2000 Select Asset Loan payments.  (Docket Entry No. 73 at 22–23).  AFFC asserts that the September 30, 2000 payment is a credit against the $5,035,064 antecedent debt Comstar carried on its books as a payable to Insurance Holdings based on Insurance Holdings's payoff of the Comstar Note.  (Docket Entry No. 73 at 13–14).  AFFC points to evidence showing that at the end of July 2000, after the Series A Redemption and after AFFC had returned the Comstar Note as paid and cancelled, IFS's books showed that IFS was indebted to Comstar for the value of the Comstar Loan, and Comstar's books showed that Comstar was indebted to Insurance Holdings for the value of the Comstar Loan less adjustments and payments made during May and June 2000.  (*Id.* at 14).  AFFC claims that in September

24

2000, both Comstar and Insurance Holdings offset the Select Asset Loan payments against the debt owing from Comstar to Insurance Holdings for the Comstar Loan payment.  (*Id.*).

Comstar's general ledger for October 2000 shows that Comstar credited $2,513,100 against its Insurance Holdings account payable for "Pmnt on collateralized loans." (Docket Entry No. 73, Ex. S at 9).  Insurance Holdings's ledger for the same period shows that it credited its Comstar account receivable in the amount of $2,513,100 for "Pmnt on collateralized loans."  (Docket Entry No. 73, Ex. T at 2).  When Comstar made the September 2000 Select Asset Loan payments, both companies credited their balance sheets to show a reduction in Comstar's obligation to Insurance Holdings.

Smith argues that the crediting of an antecedent debt is nothing more than an accounting "gimmick." (Docket Entry No. 97 at 10).  But he does not identify any evidence controverting the accounting point that would show that Comstar did not receive reasonably equivalent value.  Smith contends that crediting Comstar's account in the amount of $2,513,100 is not worth as much as Comstar's "cash" payment of $2,513,100 on the Select Asset Loans.  The fraudulent transfer statute states that "value is given for a transfer or an obligation if, in exchange for the transfer or obligation, property is transferred or *an antecedent debt is secured or satisfied*." TEX. BUS. & COM. CODE § 24.004(a) (emphasis added); *see also In re Gerdes*,  246 B.R. at 314–15; *In re Uiterwyk*, 75 B.R. at 34.  AFFC received credit against an antecedent debt for its September 2000 payments. AFFC's motion for partial summary judgment on reasonably equivalent value is granted as to Comstar's

$2,513,100 September 2000 payment on the Select Asset Loans.

Because reasonably equivalent value is an element of Smith's claims under sections 24.005(a)(2) and 24.006(a), those claims are dismissed as to the Bradford Receivable No. 2 offset and the September 2000 Select Asset Loan payments.  Reasonably equivalent value is an element of AFFC's affirmative defense under section 24.005(a)(1); the other element of that defense is a showing that the transferee took in good faith.  TEX. BUS. & COM. CODE § 24.009(a).  Because this court has not yet resolved AFFC's summary judgment motion on good faith, Smith's section 24.005(a)(1) claims as to the Bradford Receivable No. 2 offset and September 2000 Select Asset Loan payments remain.

## III.    The Motion for Leave to Amend

Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend pleadings "'shall be freely given when justice requires,' FED. R. CIV. P. 15(a), and 'evinces a bias in favor of granting leave to amend.'"  *Martin's Herend Imports, Inc. v. Diamond & Gem Trading*, 195 F.3d 765, 770 (5th Cir. 1999) (quoting *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 597 (5th Cir. 1981)).  Leave to amend "is not automatic."  *Matagorda Ventures Inc. v. Travelers Lloyds Ins. Co.*, 203 F. Supp. 2d 704, 718 (S.D. Tex. 2000) (citing *Dussouy*, 660 F.2d at 598).  A district court reviewing a motion to amend pleadings under Rule 15(a) may consider factors such as "whether there has been 'undue delay, bad faith or dilatory motive . . . undue prejudice to the opposing party, and futility of amendment.'"  *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998) (quoting *In re Southmark Corp.*, 88

F.3d 311, 314–15 (5th Cir. 1996)).  The party seeking leave to amend bears the burden of showing that the delay in amending was due to oversight, inadvertence, or excusable neglect. *Parish v. Frazier*, 195 F.3d 761, 763–64 (5th Cir. 1999).

Paragraph 20 of the proposed amended complaint pleads facts concerning the Select Asset Loans and the amounts allegedly paid by the various debtors.  Smith seeks leave to change the total of the Select Assets Loan balances from $44,779,098.36 to $41,779,098.36. Smith's proposed change does not affect his claimed damages.  AFFC does not challenge this proposed change.  Smith's motion for leave to amend to correct paragraph 20 is granted.

Smith's proposed amended complaint would also add the affirmative defense of estoppel.  Federal Rule of Civil Procedure 8(c) requires that a party affirmatively plead estoppel.  FED. R. CIV. P. 8(c).  AFL and AFFC are insurance companies required by law to file sworn statutory reports of their financial condition with the Texas Department of Insurance.  Smith requests leave to allege that AFFC is estopped from taking a different position on the value of certain assets than it took in its statutory reports.  Smith has filed a summary judgment motion on the estoppel issue.  (Docket Entry No. 67).  AFFC has replied, (Docket Entry No. 81); Smith has responded, (Docket Entry No. 101); and AFFC has surreplied, (Docket Entry No. 111).

In their reports to the Texas Department of Insurance, AFL and AFFC valued the Select Asset Loans as unimpaired collateral worth between $32 and $40 million.  In this suit, they take the position that the loans were worthless.  In their reports to the Texas Department

27

of Insurance, AFL and AFFC similarly valued the Series A preferred stock at approximately $50 million, but in this suit, claim that the stock was worthless.  Smith claims that he did not know that AFFC would take the position that the loans and the stock were worthless until AFFC's experts produced their reports.  (Docket Entry No. 50 at 4).  Smith argues that the expert reports were made available to him only a few months before he filed this motion for leave to amend on February 8, 2006.

AFFC responds that Smith's attempt to amend is untimely.  AFFC also argues that the estoppel allegation is futile because it is without merit.

Smith filed the motion in early February 2006.  He claims that he did not learn of AFFC's new valuation position until he received reports from AFFC's experts, Ronald Vollmar and Ed Hirs, III.  Those reports are dated October 17, 2005.  Smith filed his second summary judgment motion alleging estoppel on March 17, 2006.  AFFC's argument in response spans nine pages on this issue and attaches hundreds of pages in exhibits.  Notably absent is a claim by AFFC that its response was hindered by Smith's late pleading of estoppel.  AFFC does not argue that the estoppel allegation will require additional discovery. It does not argue that the estoppel claim causes it unfair surprise or undue prejudice.  Its argument is that the proposed estoppel allegation is futile because it is without merit. AFFC's challenge on the merits to the affirmative defense of estoppel is fully presented in its response to Smith's motion for summary judgment on the issue.  To deny leave on the basis that an amendment would be futile, a court must find "beyond doubt that the plaintiff

can prove no set of facts in support of his claim which would entitle him to relief." *Jamieson By and Through Jamieson v. Shaw*, 772 F.2d 1205, 1209 (5th Cir. 1985) (citing *Conley v. Gibson*, 355 U.S. 41, 45–46 (1957)).   In this regard, there is little "distinction between analysis of the procedural context under Rule 15(a) and analysis of the sufficiency of the complaint under Rule 12(b)(6)." *Id.* (citations omitted).   AFFC has responded to Smith's summary judgment motion on the affirmative defense of estoppel, rather than challenging the sufficiency of the pleading raising the defense.   The record does not show that AFFC would be prejudiced by the assertion of the affirmative defense of estoppel.   Smith's motion for leave to amend to assert the affirmative defense of estoppel is granted.

Smith also seeks leave to amend to correct a date in paragraph 36.   In paragraph 36 Smith alleges that $3,264,720 was paid on the Select Asset Loans on March 31, 2000.   In the proposed fourth amended complaint, Smith claims that part of that amount, $1,169,690.79, was instead paid in March 2001.   Smith states that he discovered this error through loan history summaries produced by AFFC on November 29, 2005.

AFFC points out that these payments were made by the debtors and that Smith, as trustee, has had full access to their records.   AFFC argues that it will be unduly prejudiced by the proposed pleading amendment because the change would expose it to additional damages.   "A defendant is prejudiced if an added claim would require the defendant 'to reopen discovery and prepare a defense for a claim different from the [one] . . . that was before the court.'" *Smith v. EMC Corp.*, 393 F.3d 590, 596 (5th Cir. 2004) (quoting *Duggins*

29

*v. Steak 'N Shake, Inc.*, 195 F.3d 828, 834 (6th Cir. 1999)).

AFFC and Smith entered into a stipulation on September 2, 2005 that "AFFC will assume financial responsibility to Plaintiff for any liability that AFL may be found to owe to Plaintiff in any final, non-appealable order or judgment entered in this case that awards to Plaintiff monetary damages arising from the transactions listed in Plaintiff's 'Damage Chart.'" (Docket Entry No. 13).  Smith's Damage Chart was attached to the stipulation.  The sixth item on the damage chart states, "IFS Payments on Selected Assets 3/31/00: $3,264,720.70."  (Docket Entry No. 13, Ex. A).  AFFC argues that it agreed to assume AFL's financial liability only as to the amounts listed on the Damage Chart.  AFFC argues that the date correction Smith proposes would have the effect of amending the stipulation to add damages for which AFFC would not otherwise be liable.

IFS made the payments that are the subject of the proposed motion for leave to amend.  As trustee, Smith has had full access to IFS's records and had to investigate those records to determine what claims to assert.  In September 2005, the parties stipulated that AFFC would assume financial responsibility for any liability that AFL may be found to owe Smith  arising from the transactions listed in the Damage Chart.  This Chart stated that the maximum liability for the Select Asset payments was $3,264,720.70.  Allowing Smith to change the date of the Select Asset payments at this point would expose AFFC to a damages amount, based on  payments occurring at different dates, than AFFC and Smith stipulated. The change comes at the end of the discovery period.  Because the proposed amendment is

inconsistent with the parties' stipulation and is so close to the discovery cutoff, it is prejudicial and untimely.  Smith's motion for leave to amend paragraph 36 is denied.[3]

## IV.    Conclusion

Smith's partial summary judgment motion as to reasonably equivalent value is denied. AFFC's partial summary judgment motion as to reasonably equivalent value is granted as to the offset to pay Bradford Receivable No. 2 and the September 2000 Select Asset Loan payments.  Smith's first amended motion for leave to amend is granted in part and denied in part.

SIGNED on September 29, 2006, at Houston, Texas.

_Lee H. Rosenthal_
_____
                    Lee H. Rosenthal
                 United States District Judge

---

[3]AFFC also argues that Smith's amendments are futile.  Because this court finds delay and undue prejudice, the futility arguments do not require resolution.  Those arguments require discussion of additional summary judgment motions on file that are not addressed in this opinion.

31