IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| W. STEVE SMITH, TRUSTEE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-05-1779 |
| | § | |
| AMERICAN FOUNDERS FINANCIAL, | § | |
| CORP., *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM, OPINION, AND ORDER
SETTING SCHEDULING CONFERENCE**

This case involves a bankruptcy trustee's attempt to avoid allegedly fraudulent transfers. The plaintiff, W. Steve Smith, the Chapter 7 bankruptcy trustee of the estates of IFS Financial Corporation ("IFS"), Circle Investors, Inc. ("Circle"), IFS Insurance Holdings, Inc. ("Insurance Holdings"), and Comstar Mortgage Corporation ("Comstar"), sued American Founders Financial Corporation ("AFFC") and Vesta Fire Insurance Corporation ("Vesta") under the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COM. CODE § 24.001, *et seq.*, ("TUFTA").[1] Smith challenges transactions that occurred after AFFC's 1999 merger with Securus Financial Corporation ("Securus"), one of a number of IFS's indirect subsidiaries. Smith also challenges transactions involving AFFC, IFS, and other entities related to IFS.

---

[1] Smith dismissed with prejudice all claims against Vesta. (Docket Entry No. 121).

Both sides have filed numerous motions.  This memorandum and opinion addresses the following motions:

- Smith's motion seeking summary judgment that AFFC is estopped from asserting that certain property is worthless, on the issue of alter ego, and as to whether Comstar was insolvent as of May 23, 2000 and whether IFS and its other wholly owned subsidiaries were insolvent as of June 30, 2000.  (Docket Entry No. 67).

- Smith's motion to exclude the expert testimony of Ed Hirs, III and Ronald Vollmar.  (Docket Entry No. 68).

- AFFC's motion seeking partial summary judgment that the statutes of repose apply.  (Docket Entry No. 70).

- AFFC's motion to exclude the expert testimony of William E. Avera.  (Docket Entry No. 71).

- AFFC's motion to exclude the expert testimony of James O. Kelly III. (Docket Entry No. 74).

- AFFC's motion seeking summary judgment as to whether certain transfers by nondebtors were fraudulent.  (Docket Entry No. 75).

- AFFC's motion to dismiss, to strike Smith's pleadings, or for an adverse inference instruction and motion to preclude documents as a sanction for spoliation of evidence.  (Docket Entry No. 76).

- AFFC's motion seeking summary judgment as to certain affirmative defenses.

2

(Docket Entry No. 78).

- AFFC's motion seeking summary judgment as to whether Smith has standing to bring this suit.  (Docket Entry No. 79).[2]

Based on the motions; the responses, replies, and surreplies; the parties' submissions; the record; and the applicable law, this court makes the following rulings:  AFFC's motion for partial summary judgment that Smith lacks standing to bring this suit is granted; AFFC's motion for partial summary judgment on the statutes of repose is denied; AFFC's motion for summary judgment on certain affirmative defenses is moot; AFFC's motion for partial summary judgment as to certain transfers by nondebtors is moot; the motions to exclude expert testimony are moot; Smith's second motion for partial summary judgment is moot; and AFFC's motion for sanctions is denied.  A conference to set a schedule to resolve the remaining claims is set for April 6, 2007, at 1:00 p.m.  The reasons for these rulings are explained below.

## I.    Background

The facts of this case were set out in detail in this court's earlier Memorandum and Opinion.  Briefly, Smith is the trustee for the bankruptcy estates of IFS, Insurance Holdings, Circle, and Comstar.  Smith sued AFFC and Vesta, complaining of transfers that occurred before and after the AFFC management buyout of Securus, negotiated as a merger.  Smith later dismissed with prejudice all claims against Vesta.  (Docket Entry No. 121).

---

[2]  AFFC also moves for leave to submit motions in excess of 25 pages.  (Docket Entry No. 66).  That motion is granted.

The corporate relationships that form the context for this case are neither simple nor straightforward.  Interamericas Financial Holdings Corp. ("Interamericas") is the corporate parent and 59% owner of IFS.  (Docket Entry No. 11, ¶ 12).  IFS was a holding company controlled by Hugo Pimienta.  Through subsidiaries, IFS engaged in the mortgage banking and insurance businesses.  In mid-1999, Bradford National Life Insurance Company ("Bradford"), a Louisiana insurance company owned by one of those IFS subsidiaries, Insurance Holdings, merged into American Founders Life Insurance Company ("AFL").  (Docket Entry No. 78, Ex. A at 2).  Kenneth Wayne Phillips, the former chairman of the board and chief executive officer of Bradford and a former director of Insurance Holdings, described in his affidavit the corporate structure of IFS and the insurance-related entities before the merger of Bradford and AFL:  Bradford and AFL were indirect, wholly owned subsidiaries of Securus, which was a wholly owned subsidiary of Circle, which was a wholly owned subsidiary of Insurance Holdings, which was a wholly owned subsidiary of IFS.  Securus, Circle, Insurance Holdings, and other related companies (the "IFS Group") were all ultimately owned by IFS.  Hugo Pimienta served as chairman of the board and chief executive officer of IFS.  (Docket Entry No. 78, Ex. A at 1–3).  Interamericas Financial Holdings Corp. ("IFHC") was a major shareholder of IFS.  (*Id.* at 2).

After the 1999 Bradford/AFL merger, AFL remained a wholly owned subsidiary of Laurel Life Insurance Company, which was in turn a wholly owned subsidiary of Securus, which was in turn a wholly owned subsidiary of Circle.  (Docket Entry No. 78, Ex. A at 2).  Circle was a wholly owned subsidiary of Insurance Holdings, which was a wholly owned

subsidiary of IFS. (*Id.*).  The only aspect of the corporate relationships that changed was that Bradford had merged into AFL.

In 1998 and 1999, Bradford and AFL made a series of loans totaling $41,750,000 to various individuals and corporations ("the Select Asset Loans").  (Docket Entry No. 78, Ex. A at 3).  Five of the loans were made to companies that pledged stock in corporations owning real estate in Mexico.  Three loans were made to Mexican nationals who pledged stock they owned in IFS.  (Docket Entry No. 78, Ex. A at 4).  AFFC alleges, and Phillips testified in his affidavit, that BNL and AFL made these loans at Hugo Pimienta's recommendation.  (Docket Entry No. 78 at 7; Docket Entry No. 78, Ex. A at 3).  Phillips and Wayne Allen Schreck, the former president and chief executive officer of Laurel and former senior vice-president of AFL, stated in their affidavits that they did not know of claims that the Select Asset Loans were of dubious value until late 2001.  (Docket Entry No. 78, Exs. A, B).  On April 12, 1999, Schreck and Phillips formed AFFC as a vehicle for purchasing the operating companies of Insurance Holdings.  (Docket Entry No. 78, Ex. A at 6).  AFFC concedes that "[i]t now appears that the Select Asset Loan proceeds were diverted for use by IFS and the borrowers were given investment credit in IFS or one of IFS's parent companies in exchange for their cooperation."  (Docket Entry No. 78 at 8).  Smith contends that Schreck and Phillips were aware that IFS—rather than the borrowers—was making the payments on the Select Asset Loans and receiving the loan proceeds during the relevant period.  (Docket Entry No. 1, ¶ 23).

AFL was merged into AFFC on January 31, 2000, under an agreement that AFFC

entered with Circle and IFS on September 17, 1999.  (Docket Entry No. 78, Ex. A at 4;
Docket Entry No. 78, Ex. D).  Schreck and Phillips stated that the merger occurred after
"several months of intense arms' length negotiations with Mr. Pimienta."  (Docket Entry No.
78, Ex. A at 6; Docket Entry No. 78, Ex. B at 4).  Schreck and Phillips stated that before
AFL's merger into AFFC, they first met with several potential buyers, none of whom was
interested in including the Select Asset Loans in the AFL assets to be acquired.  (Docket
Entry No. 78, Ex. A at 6; Docket Entry No. 78, Ex. B at 3).  AFFC argues that because it
"did not have the relationship with the borrowers or the various Mexican contacts that would
be related to collection and enforcement, AFFC was not willing to assume the sole risk of
the Select Asset Loans."  (Docket Entry No. 78 at 11).  AFFC created a preferred stock
structure as part of the merger to give IFS and Circle incentives to continue to facilitate
repayment of the Select Asset Loans.  This structure would also protect AFL and AFFC by
allowing them to offset the Select Asset Loans against the preferred stock.  Phillips
explained the preferred stock structure in his affidavit:

> The structure established in the Merger Agreement provided for
> the issuance by AFFC of Series A Preferred Stock to Circle,
> w[ith] preferential dividend, distribution and redemption
> features, which, however, could be paid either in cash or at
> AFFC's election, by assignments of interests in the Select Asset
> Loans, valued at the face amount of principal and accrued
> interest.

(Docket Entry No. 78, Ex. A at 8).

On the date of the AFL/AFFC merger, AFL paid dividends and distributions totaling
$49.5 million to Securus, which in turn paid the dividends and distributions to Circle, less

agreed adjustments.  (Docket Entry No. 78, Ex. B at 6).  AFFC issued Circle 50,000 shares of Series A Preferred Stock with a stated value of $1,000 per share and 50,000 Warrants that allowed Circle under certain conditions to convert the Series A Stock into AFFC common stock.  (*Id.*).  In exchange, AFFC received all of the issued stock of Securus and its subsidiaries, including AFL.  (*Id.* at 7).  AFL retained out of the $49.5 million it paid Securus $2,245,136.60 that was owing on the Select Asset Loans and $2,388,976.33 that was required to reduce the balance on one of those loans, the Luis Mendez Jimenez loan, to meet the required collateral-to-loan ratios of the Texas Department of Insurance (TDI).  AFL also retained an offset of $325,132.39 to pay a receivable owed by Bradford Brokerage, Inc., an affiliate of IFS and Insurance Holdings.  (*Id.*).  Bradford Brokerage, which is distinct from Bradford National Life Insurance Company, was not one of the subsidiaries AFFC acquired in the merger.  (Docket Entry No. 24, Ex. 1; Docket Entry No. 67, Ex. G at 41, 43; Docket Entry No. 52, Ex. F).

Phillips and Schreck stated that after the merger, all the quarterly payments due on the Select Asset Loans were paid late.  (Docket Entry No. 78, Ex. A, ¶ 19; Docket Entry No. 78, Ex. B, ¶ 18).  Phillips stated:

> After the Merger, every single quarterly payment due on the Select Asset Loans was paid late.  Denise Thoren, Vice President and Secretary, was the AFL employee responsible for collection efforts on the loans.  She would call or e-mail Mr. Gustavo Baez and inform him of the non-payment.  Within a short period of time, Mr. Baez would inform her that he had contacted the various Select Asset Loan borrowers, was collecting the money from the borrowers, and would forward the money to AFL as payment.  In this way, IFS continued to

act as a servicing agent on the Select Asset Loans.

(Docket Entry No. 78, Ex. A, ¶ 19).  Phillips and Schreck both stated that, "[a]t all times, we believed that the Select Asset borrowers were, through IFS, actually making the payments on the Select Asset Loans.  At no time were we advised that IFS or another affiliate of IFS was in fact making the payments or that any of them had assumed the responsibility for making such payments."  (*Id.*; Docket Entry No. 78, Ex. B, ¶ 18).

On May 23, 2000, Circle, IFS, and AFFC entered into a redemption agreement for Circle's 50,000 shares of Series A Preferred Stock and Warrants ("the Series A Redemption"), allegedly at Pimienta's request.  (Docket Entry No. 78, Ex. F).  AFFC paid Circle $22 million and issued Circle 30,000 shares of Series C Preferred Stock ("Series C Stock").  (*Id.*).  The Series C Stock was "redeemable in whole at any time or in part from time to time at the option of [AFFC], at its Stated Value plus accrued but unpaid dividends, in cash, in Selected Assets . . . or by set-off of Selected Asset Loss Claims or Merger Indemnity Claims, at the election of [AFFC]."  (Docket Entry No. 78, Ex. I, ¶ 5(a)).  AFFC argues that, "[t]hrough these terms, the Series C Stock served as new collateral to provide security to AFFC for the performance of the Select Asset Loans."  (Docket Entry No. 78 at 16).  Circle also gave AFFC a security interest in the Series C Stock.  (Docket Entry No. 78, Ex. G).  Phillips and Schreck testified that AFFC maintained physical possession of the Series C Stock certificates as security for the Select Asset Loans.  (Docket Entry No. 78, Ex. A, ¶ 24; Ex. B, ¶ 23).

In May 2000, AFFC made a $5.5 million loan to Comstar ("the Comstar Loan"),[3] another IFS subsidiary, again allegedly at Pimienta's request. (Docket Entry No. 78, Ex. A, ¶ 25; Docket Entry No. 78, Ex. G). Comstar pledged its receivables for the loan. (Docket Entry No. 78, Ex. A, ¶ 25). It is undisputed that Comstar and AFFC agreed that AFFC would withhold $507,561.63 from the loan proceeds paid to Comstar to pay off a debt Bradford Brokerage owed to AFL, an AFFC subsidiary. (Docket Entry No. 52 at 4–5; Docket Entry No. 24 at 4). Phillips testified that when the Series A Redemption closed on June 30, 2000, AFFC retained out of the proceeds payable to Circle an offset for the remaining balance of $5 million (less the $507,561.63 initially  withheld) owed on the Comstar Loan. (Docket Entry No. 78, Ex. A, ¶ 25). This court previously granted AFFC's summary judgment motion on this issue, finding that Comstar received reasonably equivalent value for the $507,561.63 withheld by AFFC. (Docket Entry No. 122).

In November 2000, AFFC redeemed 21,000 shares of Circle's Series C Stock ("the Series C Redemption"), again allegedly at Pimienta's request. (Docket Entry No. 78, Ex. L). AFFC agreed to pay Circle $7 million, $3.25 million of which was put in escrow. (*Id.*). Circle agreed to pay a fee of $250,000; give up 21,000 shares of Series C Stock; and give AFFC a security interest in real estate in Acapulco, Mexico, valued at approximately $25 million. (*Id.*). The interest in the real estate was allegedly to compensate AFFC for allowing Circle to redeem the collateral it had provided as security for the Select Asset Loans.

---

[3] AccuBanc changed its name to Comstar in December 1999. Some parts of the record refer to the company as AccuBanc.

(Docket Entry No. 78, Ex. A, ¶ 26).  AFFC was to pay Circle the $3.25 million out of the escrow account when AFFC received its security interest in the Acapulco real estate. (Docket Entry No. 78, Ex. L).  Phillips testified that when "IFS and Circle failed to deliver the additional collateral as promised . . . [IFS] therefore, forfeited the escrowed [money][4] under the terms of [the] agreement."  (Docket Entry No. 78, Ex. A, ¶ 26).

In September 2001, Pimienta allegedly asked AFFC to redeem the remaining 9,000 shares of Series C Preferred Stock.  (Docket Entry No. 78, Ex. A, ¶ 27).  After negotiations, AFFC agreed to apply $4,851,000 to the principal and interest payments due on the Select Asset Loans, which were in default.  AFFC also agreed to release Circle and IFS from any further liability for the unpaid balance of the Select Asset Loans in exchange for the 9,000 shares of Series C Stock.  (Docket Entry No. 78, Ex. M).

In August 2002, IFS entered Chapter 7 bankruptcy.  (Docket Entry No. 1 at 1). Phillips testified that he learned that IFS was insolvent in late October 2001.  AFL wrote off the value of the Select Asset Loans that were secured by IFS stock on December 31, 2001. (Docket Entry No. 78, Ex. A, ¶ 29).  AFL wrote off the remainder of the Select Asset Loans on December 31, 2002.  (*Id.*).

II.    **Analysis**

A.    **The Summary Judgment Standard**

Summary judgment is appropriate if no genuine issue of material fact exists and the

---

[4] Phillips and Schreck both refer to the amount in escrow as $3.5 million.  The redemption agreement indicates that it was $3.25 million.

moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact. *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact but need not negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986)). If the moving party fails to meet its initial burden, the summary judgment motion must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics*

*Trafficking Task Force*, 379 F.3d 293, 302 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1076 (5th Cir. 1994).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson*, 477 U.S. at 255. "Rule 56 mandates the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

Because AFFC has challenged Smith's standing to bring the claims at issue, this court addresses that threshold issue first. *See Rivera v. Wyeth-Averst Labs*, 283 F.3d 315, 319 (5th Cir. 2002) ("[W]e must decide standing first, because it determines the court's fundamental power even to hear the suit.").

## B.    Standing

Smith brings his fraudulent-transfer claims under section 544(b) of the Bankruptcy Code, seeking to avoid several transfers under the Texas Uniform Fraudulent Transfer Act, ("TUFTA"), Tex. Bus. & Com. Code § 24.001, *et seq.* Smith's claims are brought under the TUFTA sections 24.005(a)(1), 24.005(a)(2), and 24.006(a). Section 24.005(a) provides:

> A transfer made or obligation incurred by a debtor is fraudulent
> as to a creditor, whether the creditor's claim arose before or
> after the transfer was made or the obligation was incurred, if the

12

debtor made the transfer or incurred the obligation under any of the following:

(1)     With actual intent to hinder, delay or defraud any creditor of the debtor.

(2)     Without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor either:

(a)     Was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

(b)     Intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

TEX. BUS. & COM. CODE § 24.005(a).  Section 24.006(a) provides:

A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

TEX. BUS. & COM. CODE § 24.006(a).  Bankruptcy Code section 544(b) provides:

Except as provided in paragraph (2), the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.

13

11 U.S.C. § 544(b). Section 544(b) gives the trustee the power to avoid the debtor's transfers or obligations that are avoidable by an actual, existing unsecured creditor under authority outside the bankruptcy law. *In re Radcliffe's Warehouse Sales, Inc.*, 31 B.R. 827, 832 (Bankr. W.D. Wash. 1983) ("Like Prometheus bound, the trustee is chained to the rights of creditors in the case under title 11. If there are not creditors within the terms of section 544(b) against whom the transfer is voidable under applicable law, the trustee is powerless to act as far as 544(b) is concerned." (citations omitted)).

AFFC challenges Smith's standing to bring the fraudulent-transfer claims. (Docket Entry No. 79). To establish standing, Smith must show the existence of an actual unsecured creditor holding an allowable unsecured claim who could avoid the transfer in question under the applicable provisions of the TUFTA. 11 U.S.C. § 544(b); *In re Marlar*, 267 F.3d 749, 753 (8th Cir. 2001); *In re Imageset, Inc.*, 299 B.R. 709, 715 (Bankr. D. Me. 2003) (trustee must demonstrate the existence of an actual unsecured creditor holding an allowable unsecured claim who could avoid the transfer); *In re Panama Williams, Inc.*, 211 B.R. 868, 871–72 (Bankr. S.D. Tex. 1997) (trustee must identify a real, existing creditor with an allowable unsecured claim); *In re Wingspread Corp.*, 178 B.R. 938, 945 (Bankr. S.D.N.Y. 1995) (trustee must show that at least one of the present unsecured creditors of the estate holds an allowable claim, against whom the transfer was invalid under applicable state or federal law).

A trustee's rights to avoid a transfer are derivative of an actual unsecured creditor's rights. *In re Wingspread Corp.*, 178 B.R. at 945. If the creditor is estopped or barred from

recovery, so is the trustee.  *In re Marlar*, 252 B.R. at 754.  The trustee is also subject to defenses that could be asserted against the unsecured creditor.  *Id.*  The burden is on the trustee seeking to avoid the transfer to demonstrate the existence of an actual creditor with a viable cause of action against the debtor, which is not time-barred or otherwise invalid. *In re G-I Holdings, Inc.*, 313 B.R. 612, 632–33 (Bankr. D.N.J. 2004).

To have an allowable unsecured claim, a creditor must also satisfy the requirements of the Bankruptcy Code, including timely filing a proof of claim.  11 U.S.C. § 501; FED. R. BANKR. P. 3002(a).  If a proof of claim is timely filed, it is deemed allowed unless a party in interest objects. 11 U.S.C. § 502(a).  Section 502(d) disallows the claims of creditors who have received avoidable transfers, unless the creditor relinquishes the transfer.  11 U.S.C. § 502(d); *In re Am. W. Airlines, Inc.*, 217 F.3d 1161, 1163–64 (9th Cir. 2000).  Section 502(d) provides:

> Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545, 547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title.

11 U.S.C. § 502(d).

Smith asserts claims on behalf of four debtors:  IFS, Insurance Holdings, Circle, and Comstar.  Smith has the burden of demonstrating the existence of an actual creditor with a viable cause of action against each debtor under sections 24.005(a)(1) and 24.005(a)(2), and

section 24.006(a) of the TUFTA. *In re 9281 Shore Road Owners Corp.*, 187 B.R. 837, 851 (E.D.N.Y. 1995); *In re Int'l Loan Network, Inc.*, 160 B.R. 1, 18 (Bankr. D.D.C. 1993).

     *1.    IFS*

Smith asserts that three creditors have viable causes of action against IFS under sections 24.005(a)(1) and 24.005(a)(2). The creditors are Blitz, GCM, and Household Financial. (Docket Entry No. 123, ¶ 44). Smith also asserts that Blitz and GCM have viable claims against IFS under section 24.006(a). (*Id.*, ¶ 50). AFFC argues that none of these creditors has a viable claim against IFS.

AFFC argues that under section 502(d) of the Bankruptcy Code, Blitz does not have a claim against IFS because Blitz was the transferee of a fraudulent transfer of approximately $74 million from IFS. (Docket Entry No. 79 at 12). Smith responds that this court's previous judgment in favor of Blitz in *Blitz Holdings Corp. v. Interamericas Financial Holdings Corp., et al.* (*Blitz I*), Civ. A. No. H-00-2247 (S.D. Tex. June 27, 2002), and Blitz's corresponding proof of claim filed in the IFS bankruptcy case, make Blitz a creditor with a viable claim against IFS. (Docket Entry No. 99 at 3–4).

Smith correctly states that a properly filed proof of claim is *prima facie* evidence of a claim's validity and amount. *See In re O'Connor*, 153 F.3d 258, 260 (5th Cir. 1998); FED. R. BANKR. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim."). AFFC responds that while a properly filed proof of claim is *prima facie* evidence of a claim's

validity and amount, the presumption may be rebutted. *In re O'Connor*, 153 F.3d at 260. AFFC rejects Smith's argument that the presumption cannot be rebutted in this case because proof of claim was based on the final judgment in *Blitz I*. AFFC points out that *Blitz I* did not and could not have raised the issue of whether the underlying transaction was fraudulent. In entering the judgment in *Blitz I,* this court did not decide whether the transfers to Blitz were fraudulent. In addition, neither Smith nor AFFC was a party to the *Blitz I* case. Under the law of preclusion, according to AFFC, this court's previous judgment in *Blitz I* does not prevent a determination in this bankruptcy proceeding that Blitz did not have a valid claim against IFS. AFFC argues that because Smith admits in his pleadings that Blitz's claim was the product of a fraudulent transfer, this admission rebuts the proof-of-claim presumption and establishes that the $74 million transfer from IFS to Blitz was fraudulent. *See White v. Arco/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983) ("Normally, factual assertions in pleadings and pretrial orders are considered to be judicial admissions conclusively binding on the party who made them."). Smith relies on the *Blitz I* judgment and Blitz's proof of claim in the IFS bankruptcy case to support his contention that he has standing to assert Blitz's claim against IFS.

Smith's fourth amended complaint provides the following summary of the relationship among IFHC, IFS, GCM, and Blitz, the parties to the transaction underlying the *Blitz I* litigation. (Docket Entry No. 123). IFHC and IFS are part of the Interamericas Group, a group of companies owned and controlled by Hugo Pimienta, the president and CEO of IFS. (*Id.*, ¶¶ 7, 12). Blitz was a subsidiary of GCM. IFHC owned a majority of IFS

stock, which was IFHC's primary asset.  (*Id.*, ¶ 12).  IFS owned companies involved in the mortgage and insurance industries.  (*Id.*, ¶ 7).  IFHC was indebted to GCM on a $50 million bearer note issued in 1997 and had pledged its ownership in IFS stock as collateral on that debt.  (*Id.*, ¶ 12).  GCM also provided the Interamericas Group with an additional $15 million in capital by purchasing preferred shares of IFS, which carried an option for GCM to require IFS to repurchase the shares upon the earlier of the expiration of six months or the sale of an IFS mortgage banking subsidiary.  (*Id.*, ¶ 13).  Before the bearer note matured or the preferred share repurchase obligation was exercisable, the parties agreed to restructure their arrangements.  (*Id.*, ¶ 14).  The restructuring resulted in the Interamericas Group owing approximately $95 million to GCM.  Part of this restructuring required IFHC and IFS to maintain certain financial ratios, to be verified by a national accounting firm.  (*Id.*).  The 1998 audit showed that IFS had a net worth of approximately $119 million.  After paying approximately $20 million on its debt to GCM, the Interamericas Group defaulted in early 2000.  (*Id.*, ¶ 17).  After GCM filed suit, the parties entered a settlement agreement and agreed to restructure their deal yet again.

On May 15, 2000, Blitz and IFS executed a Commercial Loan Agreement ("CLA"). (Docket Entry No. 79, Ex. C).  In the CLA, the parties restructured $74,123,588.82 of the debt owed by the Interamericas Group to GCM.  The CLA stated in part that "[a]ll proceeds of the Loan shall be used on the date hereof to purchase from GCM . . . all indebtedness of IFHC held by GCM . . . at a price equal to all principal thereof and all accrued and unpaid interest thereon."  (*Id.*).  Under the CLA terms, Blitz became the owner and holder of a May

18

15, 2000 promissory note from IFS in the amount of $74,123,588.82. (*Id.*, Ex. F). IFS wrote GCM a check for $74,123,588.82 with the notation, "pay off debt of IFHC to GCM." (*Id.*, Ex. E). This transaction was memorialized in a "Note Purchase Agreement" between IFS and GCM, dated May 15, 2000. (*Id.*, Ex. D). Under the Note Purchase Agreement, IFS became the "owner and holder" of the promissory notes executed by IFHC and payable to GCM.

The check IFS issued to GCM was never cashed. Instead, it was stamped "Cancelled." (*Id.*, Ex. E). Smith states that the payment to GCM occurred through multiple bookkeeping entries that resulted in a credit to GCM in the amount of $74,123,588.82, an account-receivable entry to Blitz in that amount, and a corresponding account-payable entry in IFS's books. (*Id.*, Ex. G at 4). Smith stated that the "$74 million transaction involved book entries, releases and assumption of debt. No cash was exchanged." (*Id.*). IFS took on a $74 million debt, much of which it did not previously owe. Blitz became the payee of that debt, replacing its parent, GCM.

Smith states in his fourth amended complaint:

> The parties finalized the new loan restructuring on May 23, 2000 by executing what was called the Commercial Loan Agreement (the "CLA"). It was in this agreement that Blitz, GCM's subsidiary, was substituted for GCM as the nominal payee of the restructured debt and IFS replaced IFHC as the principal obligor. The note issued to Blitz from IFS was approximately $74 million. . . . Little did Blitz realize, IFS was rendered insolvent as a result of the CLA. Pimienta knew, or should have known, that the debt created by the CLA was beyond IFS's ability to pay.

19

(Docket Entry No. 123, ¶ 17).  Smith also states that "[s]hortly after the January 31, 2000 Closing of the Merger Agreement, Blitz loaned $74 million to IFS, which was used to pay the balance of the GCM obligation of its parent, IFHC.  This was accomplished pursuant to a Commercial Loan Agreement dated May 15, 2000 (the "CLA") between IFS and Blitz." (*Id.*, ¶ 29).  Smith testified in his deposition that he was unaware of any benefit IFS received from taking on the GCM debt, except that IFS was able to "live for several more years," not to conduct business, but to liquidate.  (Docket Entry No. 79, Ex. A at 263–64).

Smith's accounting expert, James P. Smith, conducted an insolvency analysis of IFS. He concludes that IFS was insolvent as of June 30, 2000, "as indicated by an excess of debts owed in excess of assets in the amount of at least $69,145,806."  (*Id.*, Ex. X at 3).  James P. Smith relied on section 101(32)(A) of the Bankruptcy Code for the definition of "insolvency."  This section states that "insolvency is a financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation."  11 U.S.C. § 101(32)(A).  James P. Smith also cites to the TUFTA definition, which states that "a debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent."  TEX. BUS. & COM. CODE § 24.003(b).

The proof of claim based on this court's entry of final judgment in the *Blitz I* litigation does not establish an irrebuttable presumption that Blitz is a creditor with an allowable claim against IFS, as Smith contends.  In that litigation, Blitz sought to prevent the removal of assets from IFS after the execution of the CLA.  The assets that Blitz sought to protect served as security for the promissory note IFS had issued to Blitz.  On June 30, 2000, Blitz sued IFS

and others, alleging that IFS had sold nearly all its valuable holdings and assets, leaving the promissory note undersecured.  At the same time, Blitz initiated contractual arbitration proceedings against IFS based on allegations that IFS had defaulted under the CLA.  In October 2000, the parties agreed to a partial restructuring of IFS's promissory note to Blitz. The arbitrator issued a ruling on April 17, 2001, finding in favor of Blitz on each issue submitted.  On June 26, 2001, this court confirmed the arbitrator's award under the Federal Arbitration Act, 9 U.S.C. § 10.  Final judgment based on that confirmed award was entered on June 28, 2002.

The arbitration proceeding addressed IFS's debt to Blitz under the CLA and the promissory note.  The only issues the parties arbitrated were the debt IFS owed to Blitz under the CLA and the promissory note.  The arbitrator made the following findings: (1) Blitz was the holder of the October 2000 promissory note from IFS, in the amount of $72,744,856.48; (2) IFS was in material default of the CLA; (3) Blitz was not in material default of the CLA or any other agreement between the parties; (4) IFS was entitled to certain credits, resulting in a finding that IFS owed Blitz the amount of $64,747,198.48; (5) the nondefault interest rate was fourteen percent; (6) the default interest rate was eighteen percent; (7) IFS had failed to prove any valid defense to acceleration, collection, or foreclosure; (8) Blitz was entitled to take all actions permitted under the CLA and promissory note to collect, including accelerating the principal and interest due and foreclosing on pledged collateral; (9) Blitz was entitled to recover $500,000 for reasonable attorneys' fees, $35,000 in costs related to collection and bringing the arbitration, and

$11,000 for the costs of the arbitration itself; and (10) IFS was not entitled to recover its attorneys' fees or costs.

In the June 26, 2001 Memorandum and Order confirming the arbitration award, this court's examination was limited to that permitted under the Federal Arbitration Act, 9 U.S.C. § 10. This court examined two issues related to the arbitration: whether Blitz had standing to compel IFS to arbitrate and whether the arbitration award was procured by fraud. As to the first issue, IFS and the other defendants argued that Blitz lacked standing because after the parties restructured the loan in October 2000, Blitz had transferred the October 2000 note by a Deed of Settlement. After a lengthy analysis, this court determined that under the CLA terms, the purported transfer in the Deed of Settlement was void, which meant that Blitz was the owner and holder of the October 2000 note and had standing to pursue IFS in arbitration. *Blitz I*, Civ. A. No. H-00-2247, at 14–27 (S.D. Tex. June 26, 2001).

As to the issue of whether the arbitration award was procured by fraud, this court undertook the "extraordinarily narrow" review under section 10 of the Federal Arbitration Act. 9 U.S.C. § 10; *see Blitz I*, Civ. A. No. H-00-2247, at 27–28 (S.D. Tex. June 26, 2001) (citing *Forsythe Int'l v. Gibbs Oil Co. of Tex.*, 915 F.2d 1017, 1020 (5th Cir. 1990); *Gulf Coast Indus. Workers Union v. Exxon Co., USA*, 70 F.3d 847, 850 (5th Cir. 1995)). In *Blitz I*, IFS alleged that an officer of Blitz committed perjury during the arbitration proceedings by testifying that Blitz owned the October 2000 note, and that Blitz failed to disclose the existence and effect of the Deed of Settlement. After another lengthy analysis, this court found that the defendants had not met their burden of showing that the arbitration award was

procured by fraud on either ground and confirmed the arbitration award against IFS.

As a threshold matter, this court must determine whether issue or claim preclusion applies to prevent examination of the transaction underlying the confirmed arbitration award and judgment. Bankruptcy law does not preclude courts from examining an underlying judgment on which creditor status is based. *See Katchen v. Landy*, 382 U.S. 323, 334 (1966); *In re Erlewine*, 349 F.3d 205, 210–11 (5th Cir. 2003) (holding that neither res judicata nor collateral estoppel barred a trustee's avoidance action challenging the bankrupt's divorce decree as a preferential transfer); *In re Food Fast Holdings, Ltd.*, Civ. A. No. 6:04-562, 2006 WL 2259842, at *5 (E.D. Tex. Aug. 7, 2006) (citing *Katchen* and precluding the trustee's avoidance suit on res judicata and judicial estoppel grounds). Preclusion principles ordinarily would prevent a party from attacking another court's judgment in the bankruptcy court; however, under *Pepper v. Litton*, 308 U.S. 295 (1939), inherent in the bankruptcy court's equitable powers is the ability to look into the validity of any claim asserted against a debtor's bankruptcy estate. *Pepper*, 308 U.S. at 305.

In *Pepper*, the Supreme Court rejected a res judicata claim and emphasized the broad equitable powers of bankruptcy courts:

> [A] bankruptcy court has full power to inquire into the validity of any claim asserted against the estate and to disallow it if it is ascertained to be without lawful existence. And the mere fact that a claim has been reduced to judgment does not prevent such an inquiry. As the merger of a claim into a judgment does not change its nature so far as provability is concerned, so the court may look behind the judgment to determine the essential nature of the liability for purposes of proof and allowance. . . . And the

> bankruptcy trustee may collaterally attack a judgment offered as
> a claim against the estate for the purpose of showing that it was
> obtained by collusion of the parties.

*Id.* at 305–06 (citations omitted).  In that case, Litton, the controlling stockholder of the

debtor corporation, caused the debtor to confess judgment in his favor, giving Litton a

judgment lien against the debtor for his alleged unpaid salary.  *Id.* at 297.  The bankruptcy

court found "a planned and fraudulent scheme," and that the judgment lien and subsequent

transfer of property to Litton under that lien were steps "in a general fraudulent

plan . . . designed to defeat creditors."  *Id.* at 312.  The Court's holding affirmed the

bankruptcy court's power to look behind the consent judgment.  *Id.* at 306.

    *Pepper v. Litton* has been widely followed.  *See, e.g.*, *In re XYZ Options, Inc.*, 154

F.3d 1262, 1267–68 (11th Cir. 1998) ("Where a prior judgment against the bankrupt was

procured as part of a collusive scheme to hinder, delay, or defraud creditors, as in *Pepper v.

Litton* and as the fact finder might find in the instant case, res judicata does not preclude

inquiry by the bankruptcy court."); *In re Raynor*, 922 F.2d 1146, 1148 (4th Cir. 1991)

(stating that if the issues have not actually been litigated at the time of a judgment, the

bankruptcy court may look behind that judgment); *In re Beck-Rumbaugh Assoc., Inc.*, 103

B.R. 628, 633–34 (Bankr. E.D. Pa. 1989) (finding that, in light of *Pepper v. Litton* and its

progeny, the bankruptcy court could look behind a state-court consent judgment that was

entered into collusively to deprive another creditor of its lawful stake in the proceeds of the

debtor); *In re Fill*, 82 B.R. 200, 217–18 (Bankr. S.D.N.Y. 1987) (citing *Pepper v. Litton* and

holding that the bankruptcy court was not precluded from setting aside the judgment and further noting that the judgment was "collusive and laced with fraud"); *see also Archer v. Warner*, 538 U.S. 314, 320–23 (2003) (rejecting the appellate court's finding that settlement of a claim of fraud acted as a novation, replacing the original debt that had possibly been obtained by fraud with a new debt); *Brown v. Felsen*, 442 U.S. 127, 138–39 (1979) (holding that the bankruptcy court was not precluded from looking behind the state-court stipulation and judgment to determine whether a debt was nondischargeable because it was a debt for money obtained by fraud).  The *Pepper v. Litton* line of cases apply to claims that the underlying judgment was based on constructively fraudulent transfers as well as actual fraud and collusion.  *See In re XYZ Options, Inc.*, 154 F.3d at 1270–75 (affirming the district court's use of *Pepper v. Litton* to look behind creditor's state-court judgment to determine whether the underlying transfers on which the judgment was based were constructively or actually fraudulent under 11 U.S.C. § 548); *In re Fill*, 82 B.R. at 215–21 (looking behind the creditor's judgment that served as the basis for his claim to determine if underlying transactions were constructively or actually fraudulent under 11 U.S.C. § 544(b) and New York's Debtor and Creditor Law §§ 273, 273-a, & 276).  The fact that Blitz has an unsecured judgment against IFS that is the basis of the proof of claim does not by itself make the presumption established by the proof of claim irrebuttable.  The existence of the judgment does require an analysis of preclusion principles.  But the existence of the judgment does not prevent an analysis of the underlying transaction to determine whether the claim is valid.

Res judicata, or claim preclusion, bars relitigation of claims that were or could have

been adjudicated as part of the earlier action.  *Test Masters Educ. Servs., Inc. v. Singh*, 428

F.3d 559, 571 (5th Cir. 2005).  Claim preclusion requires four elements: (1) the parties must

be identical in the two actions; (2) the prior judgment must have been rendered by a court

of competent jurisdiction; (3) there must be a final judgment on the merits; and (4) the same

claim or cause of action must be involved in both cases.  *Id.*; *Petro-Hunt, L.L.C. v. United*

*States*, 365 F.3d 385, 395 (5th Cir. 2004).  To determine whether both suits involve the same

cause of action, courts in this circuit use the transactional test.  *Petro-Hunt*, 365 F.3d at 395.

Under this test, a prior judgment's preclusive effect extends to all rights of the plaintiff with

respect to all or any part of the transaction, or series of connected transactions, out of which

the original action arose.  *Id.* at 395–96.  What constitutes a "transaction" or a "series of

transactions" must be determined pragmatically, giving weight to such considerations as

whether the relevant facts are related in time, space, origin, or motivation, whether they form

a convenient trial unit, and whether their treatment as a unit conforms to the parties'

expectations or business understanding or usage.  *Id.* at 396 (quoting RESTATEMENT

(SECOND) OF JUDGMENTS § 24(2)).  If a party could only win the second suit by convincing

the court that the prior judgment was in error, the second suit is barred.  *N.Y. Life Insur. Co.*

*v. Gillispie*, 203 F.3d 384, 387 (5th Cir. 2000).  The critical issue is whether the two actions

are based on the "same nucleus of operative facts."  *Id.*; *see also Davis v. Dallas Area Rapid*

*Transit*, 383 F.3d 309 (5th Cir. 2004).

　　　　Res judicata does not apply here because the parties to the two suits were not

identical—neither Smith nor AFFC was a party to the *Blitz I* litigation—and the two cases

do not involve the same claims or causes of action.  *Blitz I* dealt with the CLA, the parties'
subsequent restructuring of the promissory notes, and the arbitration of IFS's alleged breach
of the CLA.  Because the two cases do not involve the same parties or the same claims, res
judicata does not bar this court from examining the transaction underlying the *Blitz I*
judgment.

Nor does issue preclusion bar examination of the transaction underlying the *Blitz I*
judgment.  Issue preclusion bars a party from litigating an issue resolved in an earlier action
between the same parties only if:  (1) the issue at stake is identical to the one involved in the
earlier action; (2) the issue was actually litigated in the prior action; and (3) the
determination of the issue in the prior action was a necessary part of the judgment in that
action.  *Petro-Hunt*, 365 F.3d at 397.  The issue in *Blitz I* was whether the arbitration award
was procured by fraud, one of the few grounds available under the Federal Arbitration Act
for overturning an arbitration award.  Resolution of that issue turned on whether a Blitz
official perjured himself during the arbitration proceeding and Blitz's alleged failure to
disclose the fact that it had entered into the Deed of Settlement.  None of the issues
addressed in *Blitz I* touched on the issue here: whether the CLA and the corresponding
promissory note constituted a fraudulent transfer.  In *Blitz I*, this court did not determine
whether the CLA or the notes IFS issued to Blitz were fraudulent transfers.  Nor did the
arbitrator make any findings on that issue.  Issue preclusion does not bar examination of
whether Blitz's asserted creditor status is based on a fraudulent transfer.

Section 24.005(a)(2) of the TUFTA states that a transfer is fraudulent if the debtor

27

incurred the obligation "without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor . . . intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due." TEX. BUS. & COM. CODE § 24.005(a)(2).  The TUFTA also provides that "a debtor who is generally not paying the debtor's debts as they become due is presumed to be insolvent." TEX. BUS. & COM. CODE § 24.003(b).  Smith alleged in his complaint that issuing the promissory note to Blitz in May 2000 made IFS insolvent.  (Docket Entry No. 123, ¶ 17).  Smith's accounting expert, James P. Smith, reached the same conclusion. (Docket Entry No. 79, Ex. X).  Smith also alleged that Pimienta knew, or should have known, that the debt created by the CLA and promissory note was beyond IFS's ability to pay.  (Docket Entry No. 123, ¶ 17).  Smith's allegations are binding admissions against him. *White*, 720 F.2d at 1396; *Wyatt v. Hunt Plywood Co., Inc.*, 297 F.3d 405, 411–12 (5th Cir. 2002).  Facts that are admitted in the pleadings "are no longer at issue."  *Ferguson v. Neighborhood Housing Servs., Inc.*, 780 F.2d 549, 551 (6th Cir. 1986).  Smith's own allegations and evidence show that taking on almost $75 million in debt to Blitz in May 2000 made IFS insolvent and that Pimienta knew or should have known of the insolvency.

The record evidence also shows that Blitz did not receive reasonably equivalent value in exchange for assuming IFHC's indebtedness to GCM, another element in showing that the transfer was fraudulent under section 24.005(a)(2).  "'Reasonably equivalent value' includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." TEX. BUS.

& COM. CODE § 24.004(d).  Courts interpreting "reasonably equivalent value" under the

Uniform Fraudulent Transfer Act frequently use the same interpretation given to this phrase

in the Bankruptcy Code, 11 U.S.C. § 548(a).  *See, e.g.*, *In re Hinsley*, 201 F.3d 638, 643–44

(5th Cir. 2000); *In re Image Worldwide, Ltd.*, 139 F.3d 574, 577 (7th Cir. 1998) (stating that

the UFTA took the phrase "reasonably equivalent value" from 11 U.S.C. § 548(a)(2)); *In re*

*Bargfrede*, 117 F.3d 1078, 1080 (8th Cir. 1997) (per curiam); *In re Viscount Air Servs., Inc.*,

232 B.R. 416, 434 (Bankr. D. Ariz. 1998) (noting that states adopting the UFTA interpret

"reasonably equivalent value" in that statute the same way as that term is interpreted in the

Bankruptcy Code).

The value of consideration given for a transfer alleged to be fraudulent is determined

from the standpoint of the debtor's creditors.  *See In re Hinsley*, 201 F.3d at 643–44

(applying the TUFTA); *In re Viscount Air Servs.*, 232 B.R. at 434 (interpreting the Arizona

Uniform Fraudulent Transfer Act).  "The proper focus is on the net effect of the transfers on

the debtor's estate, the funds available to the unsecured creditors."  *In re Hinsley*, 201 F.3d

at 644 (quoting *In re Viscount Air Servs.*, 232 B.R. at 435); *In re Jeffrey Bigelow Design*

*Group, Inc.*, 956 F.2d 479, 484 (4th Cir. 1992) ("As long as the unsecured creditors are no

worse off because the debtor, and consequently the estate, has received an amount

reasonably equivalent to what it paid, no fraudulent transfer has occurred.").  Value is

determined as of the transfer date.  *Leibowitz v. Parkway Bank & Trust Co.*, 210 B.R. 298,

301–02 (N.D. Ill. 1997); *Mladenka v. Mladenka*, 130 S.W.3d 397, 407 (Tex. App.—Houston

[14 Dist.] 2004, no pet.).  Courts generally compare the value of the property transferred

with the value of the property received in exchange for the transfer.  *In re Sullivan*, 161 B.R. 776, 781 (Bankr. N.D. Tex. 1993).

The analysis is slightly more complicated when, as here, the transfer involves a third party, because the benefit to the debtor may be harder to determine.  A court should "examine all aspects of the transaction and carefully measure the value of all benefits and burdens to the debtor, direct or indirect."  *In re Newtowne, Inc.*, 157 B.R. 374, 378–79 (Bankr. S.D. Ohio 1993) (quoting *In re Pembroke Dev. Corp.*, 124 B.R. 398, 400 (Bankr. S.D. Fla. 1991)).  Generally, a transferor receives less than reasonably equivalent value when it transfers property in exchange for consideration that passes to a third party. *Leibowitz*, 210 B.R. at 301–02.  "If the debt secured by the transaction is not the debtor's own, then his giving of security will deplete his estate without bringing in a corresponding value from which his creditors can benefit, and his creditors will suffer just as they would if the debtor had simply made a gift of his property or obligation."  *Rubin v. Mfrs. Hanover Trust* Co., 661 F.2d 979, 991 (2d Cir. 1981) (applying the former Bankruptcy Act's "fair consideration" provision).  When the consideration for a transfer passes to the parent corporation of a debtor-subsidiary that is making the transfer, as in this case, the benefit to the debtor may be presumed to be nominal, absent proof of specific benefit to the debtor itself.  *In re Royal Crown Bottlers of N. Ala., Inc.*, 23 B.R. 28, 31 (Bankr. N.D. Ala. 1982).  Courts are willing to consider indirect benefits received by a debtor only if those benefits are "fairly concrete." *In re Nat'l Century Fin. Enters., Inc.*, 341 B.R. 198, 215 (Bankr. S.D. Ohio 2006) (quoting *In re Gerdes*, 246 B.R. 311, 314 (Bankr. S.D. Ohio 2000)).  As the Third Circuit has

observed:

> The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the commercial value of the assets transferred.  Thus, when the debtor is a going concern and its realizable going concern value after the transaction is equal to or exceeds its going concern value before the transaction, reasonably equivalent value has been received.

*Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 647 (3d Cir. 1991).

In *In re Newtowne, Inc.*, 157 B.R. at 379, the court identified three common scenarios in which a debtor's discharge of a third party's debt may be for reasonably equivalent value. The first is when the debtor's payment of a third party's debt results in a discharge of the debtor's own debt to the third party. *Id.*  But if no corresponding obligation of the transferor is discharged, courts have not hesitated to avoid transfers made to satisfy a third party's debt. *See, e.g.*, *In re Bargfrede*, 117 F.3d at 1079–80 (holding that the debtor's transfer to a church to pay the debt of his embezzling wife was avoidable).  The second scenario is when the debtor and the third party are so "related or situated that they share an identity of interests because what benefits one will . . . benefit the other to some degree." *In re Newtowne, Inc.*, 157 B.R. at 379 (quoting *In re Pembroke Dev. Corp.*, 124 B.R. at 400).  Finally, when a debtor "enjoys the benefits of the goods or services it bought for its principal, the transfer of money for those goods or services may not be avoided." *Id.*

The first and third scenarios do not apply to these facts.  The question is whether IFS received value reasonably equivalent to the $74 million debt it incurred for paying off the

debt of its parent corporation, IFHC.

In *In re Jolly's, Inc.*, 188 B.R. 832 (Bankr. D. Minn. 1995), the bankruptcy court addressed facts similar to this case. The debtor in that case had been wholly owned by the defendants, the Vinitsky Trust and Shirley Vinitsky. In a November 1983 leveraged buyout, Svihel Enterprises, Inc. ("SEI") purchased the shares in the debtor from the Vinitsky Trust and Shirley Vinitsky, in exchange for two promissory notes in favor of the Vinitsky Trust. The notes were secured by the stock that SEI purchased. After the transaction, the debtor became a wholly owned subsidiary of SEI. Defendant James Svihel was the SEI president and sole shareholder. *Id.* at 836–37. SEI restructured its remaining debt to the Vinitsky Trust in 1991, this time granting the Vinitsky Trust a security interest in all the debtor's assets. The debtor's net worth dropped dramatically, going from a positive $202,473.25 net worth in 1990 to a negative $174,126.56 net worth in 1991. *Id.* at 837. Several of the debtor's creditors filed an involuntary petition in bankruptcy under Chapter 7. The trustee moved to avoid Vinitsky Trust's security interest in the debtor's assets as a fraudulent transfer under the Minnesota Uniform Fraudulent Transfer Act. *Id.* The bankruptcy court determined that the debtor had not received a direct benefit from pledging its assets as security for its parent's loan. The court then analyzed whether the debtor had received an indirect benefit. *Id.* at 843 (quoting *In re Minnesota Utility Contracting, Inc.*, 101 B.R. 72, 84 (Bankr. D. Minn. 1989), *aff'd*, 110 B.R. 414, 419 (D. Minn. 1990); and *Rubin*, 661 F.2d at 991). The defendants argued that the debtor had received the opportunity to continue its business in exchange for the pledge of its assets, delaying the threat that the Vinitsky Trust

would foreclose on SEI's notes.   The court held that delaying the consequences of insolvency did not show that the debtor had received value from the transfer:  "[I]f the result of the transfer is not to advance or augment the interests of the putative recipient, it cannot be said that the transfer conferred a benefit, direct or indirect."  *Id.*  The court also noted that even if the parent, SEI, had benefitted, that did not show a benefit to the debtor because they were separate entities.

*Leibowitz v. Parkway Bank & Trust Co.*, 210 B.R. 298 (N.D. Ill. 1997), *aff'd*, 139 F.3d 574 (7th Cir. 1998), also involves similar facts.  In that case, the bankruptcy trustee for Image Worldwide, the debtor, sought to avoid a pledge of accounts receivable to Parkway Bank and Trust.  The trustee argued that the pledge was a fraudulent transfer under the Illinois Uniform Fraudulent Transfer Act.  *Id.* at 299.  Parkway Bank had extended a line of credit to Image Marketing in 1991, taking a security interest in its accounts receivable.  The parties' agreement provided that Image Marketing could borrow up to 70% against its eligible accounts receivable.  Over time, Image Marketing began to collect on its outstanding accounts receivable but maintained a large line of credit with Parkway Bank, in violation of their agreement.  As a result, the loan to Parkway Bank became undersecured.  In 1994, Parkway Bank learned that Image Marketing had an affiliated company, Image Worldwide.  Parkway Bank required Image Worldwide to guarantee the loan between Image Marketing and Parkway Bank by pledging Image Worldwide's accounts receivable.  *Id.* at 300.  Image Worldwide received no money for its pledge but rather, as Parkway Bank later argued, received the promise that Parkway Bank would allow Image Worldwide "to continue in

business." *Id.*  Image Worldwide also pledged its accounts receivable to secure another loan it obtained from Parkway Bank, the proceeds of which went to Image Worldwide's president and sole shareholder, Richard Steinberg.  Steinberg used this loan to pay Image Marketing's trade debts to a third party, FCL Graphics.  The trustee sought to avoid this pledge of Image Worldwide's assets as well.

The bankruptcy court avoided these transfers as constructively fraudulent.  The district court affirmed those decisions on appeal, adopting the reasoning of *In re Jolly's*.  *Id.* at 302.  The Seventh Circuit affirmed.  *In re Image Worldwide, Ltd.*, 139 F.3d 574, 580 (7th Cir. 1998).  Although the appellate court suggested that *In re Jolly's* does not apply outside the leveraged-buyout context, the court also held that Image Worldwide did not receive reasonably equivalent value for pledging its accounts receivable to guarantee its affiliate's loan to Parkway Bank.  The court rejected the argument that Parkway Bank's forbearance from foreclosure was reasonably equivalent value, noting that Parkway Bank could not have sought repayment of the loan proceeds from Image Worldwide before entering into the agreement with that company.  As a result, Parkway Bank's forbearance from foreclosing on the Image Marketing loan did not provide a benefit to Image Worldwide.  The court concluded that Image Worldwide did not receive reasonably equivalent value for its pledge. *Id.*

The Seventh Circuit held that the Steinberg loan presented a closer case.  *Id.* at 581. Trial testimony had revealed that if Image Worldwide had not provided the collateral on the Steinberg loan, Parkway Bank would not have made the loan and Steinberg would have been

unable to pay Image Marketing's indebtedness to FCL Graphics.  FCL Graphics provided

printing services to Image Worldwide and allowed Image Marketing and Image Worldwide

to operate their businesses on FCL's premises.  Although Image Marketing was not an active

affiliate at the time, Image Worldwide's pledge of its accounts receivable to secure the loan

to Steinberg allowed Image Worldwide to continue to operate on FCL's premises and to

have FCL supply printing services.  Steinberg testified that if he had been unable to pay

FCL, Image Worldwide would have gone out of business.  *Id.*  The court acknowledged that

although the Steinberg loan guarantee made Image Worldwide insolvent, it continued as a

going concern for another 17 months.  The court held, however, that because the loan did

not strengthen the "viability of the corporate group," Image Worldwide had not received

reasonably equivalent value for pledging its accounts receivable to secure the loan to

Steinberg.  *Id.*  At the time of the Steinberg loan, Image Marketing was winding down and

inactive.  The loan made Image Worldwide insolvent to pay its inactive affiliate's debt.

"This shift of risk from the creditors of the debtor to the creditors of the guarantor is exactly

the situation that fraudulent-transfer law seeks to avoid when applied to guarantees."  *Id.* at

581–82.

Similarly, in *In re Minnesota Utility Contracting, Inc.*, 110 B.R. 414 (D. Minn. 1990),

a debtor pledged its assets as security for a loan on behalf of an affiliated company and the

bankruptcy court found that the debtor did not receive reasonably equivalent value.  The two

companies were owned by the same two individuals.  The affiliated company was the

debtor's major customer and accounted for most of its business.  *Id.* at 415.  The defendant

bank argued that the debtor received the promise of continued business from the affiliated company in exchange for pledging assets to secure the affiliate's loan. The district court affirmed the bankruptcy court's finding that the debtor had not received reasonably equivalent value for the guarantee. The court stated that there was no evidence that the debtor's net worth improved as a result of pledging its assets and that the unquantified benefit of continued business was not reasonably equivalent value for the assets it pledged to secure the $250,000 loan to the affiliated entity. *Id.* at 421.

*In re Marquis Products, Inc.*, 150 B.R. 487 (Bankr. D. Me. 1993), provides yet another example. The debtor in that case conveyed a mortgage on real property it owned to Conquest Carpet Mills, Inc., as security for a loan between Conquest and the debtor's parent company, NRF, Inc. The debtor had received several loans from NRF but the mortgage it conveyed was not offset against those debts. The trustee sought to avoid the transfer of the mortgage on the property as constructively fraudulent under section 548(a)(2) of the Bankruptcy Code. *Id.* at 490–91. The bankruptcy court evaluated whether the debtor had received indirect benefits from the transfer, observing that it occurred when the debtor was nearly insolvent. *Id.* at 492. The court held that the debtor had not received reasonably equivalent value for conveying the mortgage to serve as collateral for the loan to the parent, NRF, because NRF had not provided the debtor any further support as a result. *Id.*; *see also In re Art Unlimited*, No. 02-23992, 2006 WL 3512133 (Bankr. E.D. Wis. Dec. 6, 2006) (holding that a debtor did not receive reasonably equivalent value in exchange for the sale of its assets, the proceeds of which went to pay the debts of its principal, not to pay its own

trade creditors); *In re Newtowne*, 157 B.R. 374, 379 (Bankr. S.D. Ohio 1993) (debtor's payment of affiliated company's debt, significantly diminishing debtor's net worth, could be avoided as a fraudulent transfer).

The $74 million loan from Blitz to IFS is similar to the transfers in these cases. IFS used the proceeds of the Blitz loan to IFS to pay off the debt that IFHC, IFS's parent corporation, owed to GCM. The CLA between Blitz and IFS restructured both IFHC's debts to GCM under the $50 million bearer note and IFS's obligation under the preferred-stock option held by GCM, in exchange for which GCM had given the Interamericas Group an additional $15 million in capital. Although the record does not show what value the preferred-shares option had in May 2000, when the CLA was finalized, it is clear that IFHC's obligation on the bearer note was substantially greater than IFS's obligation on its preferred shares. IFS did not receive a direct benefit reasonably equivalent to the $74 million debt it incurred.

Nor does the record show that IFS received an indirect benefit as a result of the $74 million debt it assumed. When asked what benefit IFS received in return for incurring more than $74 million in debt (a significant portion of which was to cover IFHC's debt, not IFS's), Smith responded that IFS "got to live for several more years." (Docket Entry No. 79, Ex. A at 263–64). Smith stated in an interrogatory answer that IFS's payment of the IFHC debt prevented GCM from foreclosing on the IFS stock that GCM held as collateral for IFHC's debt. (Docket Entry No. 79, Ex. G at 4). Smith has neither presented nor identified evidence of any other benefit or consideration IFS received from this transaction. AFFC points out

37

that the only business IFS conducted between March 2000 (when it incurred the roughly $74 million in debt) and August 2002 (when it was put into bankruptcy) was to liquidate its assets. (Docket Entry No. 74 at 17). Smith testified to this effect in his deposition. (Docket Entry No. 74, Ex. A at 264:16–24). This court previously found that only months after paying IFHC's debt, IFS sold nearly all its assets, some on the same day this court entered a temporary restraining order prohibiting the sale of those assets. *Blitz I*, Civ. A. No. H-00-2247 (S.D. Tex. June 27, 2002). The $74 million loan merely shifted debt from one Interamericas company (IFHC) to another (IFS), to the detriment of IFS's creditors. IFS's net worth did not improve as a result of the loan. There is no evidence that IFHC provided any support to IFS after IFS assumed its debt. Nor is there evidence that the loan strengthened the viability of the Interamericas Group. *See In re Image Worldwide, Ltd.*, 139 F.3d at 581. The loan did not provide any indirect benefit to IFS. And even assuming that the debt restructuring allowed IFS more time to liquidate, as a matter of law, it was not reasonably equivalent to the $74 million debt.

Some courts have held that an economic benefit reasonably equivalent to the disputed transfer may flow from a debtor's ability to keep his business in operation as a result of entering into the challenged transaction. *See, e.g.*, *In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1125 (5th Cir. 1993); *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635 (3d Cir. 1991); *In re Pembroke Dev. Corp.*, 124 B.R. 398 (Bankr. S.D. Fla. 1991). These cases are easily distinguishable. In each of those cases, the challenged transaction provided some concrete benefit to the debtor's business. *In re Fairchild Aircraft*, 6 F.3d at 1123, involved

the debtor's payments of an affiliated company's trade debts.  The debtor, Fairchild Aircraft, manufactured and sold small commuter airplanes.  Fairchild's parent company also owned Air Kentucky, a commuter airline that had significant financial difficulties.  Fairchild believed that a strong working relationship with Air Kentucky would be beneficial to its business because of Air Kentucky's relationship with USAir.  Fairchild began infusing Air Kentucky with cash and paying some of its debts to keep it afloat.  Fairchild advanced Air Kentucky approximately $3,650,000.  Despite these efforts, Air Kentucky stopped its operations.  Fairchild filed for bankruptcy protection a short time later.  The Fifth Circuit held that Fairchild had received reasonably equivalent value from paying Air Kentucky's debts.  *Id.* at 1126.  It observed that had Fairchild not kept Air Kentucky afloat, Fairchild would have been forced to take back three airplanes under lease to Air Kentucky, disrupting Fairchild's ability to sell its new aircraft and Fairchild's relationship with USAir, a potential major customer, would have been lost.  Keeping Air Kentucky alive also provided an opportunity for a third party to purchase it, allowing Fairchild to recoup its investment.  *Id.*  These benefits constituted reasonably equivalent value.  In the present case, by contrast, IFS received no similar concrete benefits from paying IFHC's debt.  IFHC's primary asset was its ownership of IFS stock.  IFS was made insolvent by paying IFHC's debt.  Keeping IFHC afloat while making IFS insolvent did not provide IFS any opportunity for future growth or make either entity attractive to a potential purchaser.  Instead, the added debt decreased IFS's

net worth and the value of its stock, with no countervailing benefit.[5]

In *Mellon Bank*, 945 F.2d at 639, the court considered a loan that Mellon Bank provided to an entity that acquired a company called Metro in a leveraged buyout. As collateral for the loan, Metro gave Mellon Bank a guarantee collateralized by a security interest in substantially all its assets. Mellon Bank also provided credit to Metro, secured by Metro's assets. Less than one year later, Metro sought bankruptcy protection. A committee of unsecured creditors brought an adversary proceeding to avoid the granting of the security interests as constructively fraudulent transfers under section 548(a)(2) of the Code. The bankruptcy and district courts concluded that Metro had not received reasonably equivalent value in exchange for the security interests it provided to Mellon Bank. The Third Circuit reversed. The court recognized that "[b]ecause Metro did not receive the proceeds of the acquisition loan, it did not receive any direct benefits from extending the

---

[5] Section 4.01 of the IRS's Revenue Ruling 59-60 emphasizes that in valuing the stock of a closely held corporation, all available financial data as well as all relevant factors affecting the fair market value, should be considered, including the following:

(a)     The nature of the business and the history of the enterprise from its inception.
(b)     The economic outlook in general and the condition and outlook of the specific industry in particular.
(c)     The book value of the stock and the financial condition of the business.
(d)     The earning capacity of the company.
(e)     The dividend-paying capacity.
(f)     Whether or not the enterprise has goodwill or other intangible value.
(g)     Sales of the stock and the size of the block of stock to be valued.
(h)     The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter.

Rev. Rul. 59-60, 1959-1 C.B. 237, 239.

guaranty and security interest collateralizing that guaranty." *Id.* at 646.   In evaluating indirect benefits, the court stated, "The touchstone is whether the transaction conferred realizable commercial value on the debtor reasonably equivalent to the realizable commercial value of the assets transferred." *Id.* at 646–47 (citations omitted).   The court found that Metro had received two indirect benefits.   The first indirect benefit was Mellon Bank's extension of credit to Metro:  "The ability to borrow money has considerable value in the commercial world.   To quantify that value, however, is difficult.   Quantification depends upon the business opportunities the additional credit makes available to the borrowing corporation and on other imponderables in the operation or expansion of its business." *Id.* at 647.   The second indirect benefit created by Metro's extension of a security interest in its assets, which allowed the buyout to close, was a "legitimate and reasonable expectation that the affiliation of these two corporations . . . would produce a strong synergy." *Id.*

The present case is again very different.   IFS paid an outstanding debt that IFHC owed to GCM.   The loan did not result in the ability of IFHC to borrow money from GCM or another source.   Unlike *Mellon Bank*, there is no evidence of an expectation that the loan would produce "synergy" between IFS and IFHC.   To the contrary, IFHC's major asset was IFS stock.   When IFS assumed IFHC's debt, the value of IFS stock declined, correspondingly reducing IFHC's net worth.

A closer case is *In re Pembroke Development Corp.*, 124 B.R. 398.   In 1986, Pembroke Development Corporation, the debtor, had obtained a $4 million loan from Commonwealth Federal Savings & Loan.   At the same time, the debtor guaranteed a loan

from Commonwealth to Pembroke Charter Corporation, an affiliated company. In 1990, the debtor entered into a modification agreement with Commonwealth, agreeing to pay approximately $150,000 plus an extension fee in exchange for Commonwealth's agreement to defer the debtor's interest payments on its loan until the loan's maturity, to extend the loan's maturity date, and to forbear from foreclosing on the debtor's guarantee of the Pembroke Charter loan. *Id.* at 400. The trustee sought to avoid the modification agreement and $150,000 payment as constructively fraudulent. The bankruptcy court held that the forbearance on foreclosure provided the debtor with an indirect benefit because the debtor was the guarantor on that loan. This benefit, combined with the extension of the debtor's loan's maturity date and deferral of that loan's interest payments, were reasonably equivalent to the $150,000 paid under the modification agreement. *Id.* at 401. In this case, by contrast, IFS assumed over $74 million in debt. While a small part of the note was used to pay off IFS's obligation to GCM under the preferred-stock options, most of the loan represented debt IFS did not previously owe. The assumption of millions of dollars of IFHC's debt is not reasonably equivalent to the value of preventing GCM from foreclosing on that debt. Moreover, IFS's net worth was substantially diminished by this debt. In 1998, IFS's net worth was valued at $119 million. After the CLA transaction, IFS was insolvent. "[C]ourts should keep the equitable purposes behind fraudulent-transfer law in mind, recognizing that any significant disparity between the value received and the value surrendered will significantly harm innocent creditors." *In re Dayton Title Agency, Inc.*, 292 B.R. 857, 874 (Bankr. S.D. Ohio 2003). IFS did not receive reasonably equivalent value from assuming

the $74 million note.

This court's final judgment in *Blitz I* does not prevent examination of the CLA transaction to determine whether Blitz is an unsecured creditor with an allowable claim that provides Smith standing in the IFS bankruptcy. The undisputed facts show that as a matter of law, IFS did not receive reasonably equivalent value for incurring $74 million of IFHC's debt, which made IFS insolvent. AFFC has shown that IFS's assumption of debt by the loan from Blitz was fraudulent under section 24.005(a)(2) of the TUFTA. As the payee on the promissory note under the CLA, Blitz was the transferee of a fraudulent transfer. Section 502(d) requires that this court disallow Blitz's claim. 11 U.S.C. § 502(d); *In re Larsen*, 80 B.R. 784, 790 (Bankr. E.D. Va. 1987); *see also Melon Produce, Inc. v. Braunstein*, 112 F.3d 1232, 1239 (1st Cir. 1997) ("[T]he overall purpose of Section 502 . . . was not to punish, but to give creditors an option to keep their transfers (and hope for no action by the trustee) or to surrender their transfers and their advantages and share equally with other creditors." (internal quotation marks omitted)).[6] Smith has not presented or identified evidence that raises a fact issue as to whether Blitz was the transferee of a fraudulent transfer. Smith cannot stand in Blitz's shoes to assert claims on behalf of IFS.

Smith also attempts to step into GCM's shoes against IFS. But Smith alleges in his

---

[6] It is irrelevant to the disallowance of Blitz's claim under section 502(d) that Smith's fraudulent-transfer claim against Blitz is time-barred under section 546 of the Bankruptcy Code. *See In re Am. West Airlines, Inc.*, 217 F.3d 1161, 1167–68 (9th Cir. 2000) ("[T]he limitations period in § 546 does not apply to § 502(d)); *In re Ameriserve Food Dist., Inc.*, 315 B.R. 24, 33–34 (Bankr. D. Del. 2004) ("Section 502(d) addresses the allowability of a creditor's proof of claim where the creditor has received a voidable transfer, not the debtor's ability to commence a [fraudulent-transfer] action where the debtor fails to object to the creditor's claim."); *In re McLean Indus., Inc.*, 184 B.R. 10, 14–17 (Bankr. S.D.N.Y. 1995) (same).

complaint that Blitz was substituted for GCM as the new obligee under the CLA.  (Docket Entry No. 11, ¶ 17).  GCM was not a party to that agreement.  (Docket Entry No. 79, Ex. C).  The CLA was an agreed restructuring of $74 million in debt that IFHC owed to GCM.  The parties agreed to substitute Blitz for GCM, releasing IFHC and IFS from any obligation to GCM and making Blitz, not GCM, the creditor of IFS.  (*Id.*).  Smith does not dispute these facts or refute this argument in his response to AFFC's summary judgment motion on standing.  (Docket Entry No. 99).  When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings.  The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim.  *Johnson v. Deep E. Texas Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004).  Smith has failed to present or point to evidence raising a fact issue as to whether GCM was a creditor of IFS; Smith cannot stand in GCM's shoes to assert claims against IFS.

Smith also asserts claims against IFS based on Household Financial's status as a creditor.  Smith points to Household Financial's proof of claim filed in the IFS bankruptcy as *prima facie* evidence of the claim's validity and amount.  AFFC responds that the judgment Household Financial relies on in support of its proof of claim is actually a judgment entered against Comstar, not IFS.  (Docket Entry No. 79, Ex. O).  An examination of the record supports this argument.  Household Financial's proof of claim refers to a June 22, 2001 judgment against Comstar for $4,212,000.74 in *Household Financial Services, Inc. v. Comstar Mortgage Corp.*, Civ. A. No. 00-C-7462 (N.D. Ill. June 22, 2001).  (*Id.*).  The

44

presumption created by the proof of claim is rebutted.  There is no evidence raising a fact issue as to whether Household Financial is a creditor of IFS.  Smith is unable to stand in Household Financial's shoes as a creditor of IFS because he does not identify a claim held by Household Financial against IFS.

Smith has not shown the existence of any creditor of IFS with an allowable claim. AFFC's partial summary judgment motion on standing as to IFS is granted.

### 2.      *Insurance Holdings and Circle*

Smith agrees that the only way in which he has standing to assert claims on behalf of Insurance Holdings and Circle is to pierce IFS's corporate veil.  (Docket Entry No. 99 at 6). "Plaintiff has never maintained that Insurance Holdings or Circle had any creditors at the time of the transfers at issues in this suit, absent the application of the alter ego and single business enterprise claims." (*Id.*).  Smith points to testimony by his expert, James P. Smith, and AFFC's expert, Ronald Vollmar, to support his alter-ego contention.  James P. Smith concluded:

> Subsequent to the sale of the insurance operations to AFFC, Circle and Insurance Holdings did not have any separate financial existence.  Pimienta treated IFS, Insurance Holdings, and Circle as a single business enterprise.  It is my opinion that Insurance Holdings and Circle, wholly owned subsidiaries of IFS, were the alter egos of IFS.

(Docket Entry No. 79, Ex. X at 5).  Vollmar's deposition contained the following testimony:

> Q.      Well, do you agree that—with Mr. Smith's conclusion

> that Circle and Insurance Holdings were either alter egos
> of IFS or part of a single business enterprise with IFS?
>
> A.     Yes.
>
> Q.     Can you tell the Court exactly what facts you base your
> conclusion that Comstar was an alter ego of IFS?
>
> A.     Well, I think the facts are pretty well laid out in your
> complaint.  I mean, I don't know that they're facts, but
> they're certainly allegations, so if the—if the description
> of what Mr. Pimienta did vis-à-vis Comstar in—are
> correct in the complaint, certainly that would indicate
> he's exercising control.  And that's certainly consistent
> with what we've seen in the facts in this case . . . .

(Docket Entry No. 99, Ex. B at 37).

Smith asserts that although Insurance Holdings and Circle have no creditors, claims may be asserted on their behalf through IFS's creditors.  Because none of IFS's creditors has standing to assert claims against IFS, creditors of Insurance Holdings and Circle, as alter egos of IFS, similarly lack standing.  Blitz received fraudulent transfers and its claims are discharged under 11 U.S.C. § 502(d).  GCM is not an IFS creditor after the restructuring of the $74 million debt.  And Household Financial's only claim is against Comstar, not IFS. As a matter of law, Smith lacks standing to sue on behalf of Insurance Holdings or Circle.

### 3.     *Comstar*

Smith looks to the unsecured claims of GMAC, HUD, and Household Financial to provide him standing to bring claims on behalf of the Comstar bankruptcy estate.  (Docket

Entry No. 123, ¶¶ 47, 50).  AFFC does not challenge Smith's standing to bring claims under any of these creditors.  (Docket Entry No. 79 at 26–27; Docket Entry No. 114).  GMAC and Household Financial have filed proofs of claim in the Comstar bankruptcy case.  Smith need only point to one creditor with an unsecured claim against the debtor.  *In re Bushey*, 210 B.R. at 101.  Smith accordingly has standing to assert claims on behalf of Comstar.

AFFC's summary judgment motion on standing is granted as to IFS, Insurance Holdings, and Circle.  Smith's claims on behalf of those estates are dismissed, with prejudice.  Smith has standing to sue on behalf of the Comstar estate.

### C.    The Statute of Repose

In the September 29, 2006 Memorandum and Opinion, this court dismissed Smith's claims on behalf of the Comstar estate under sections 24.005(a)(2) and 24.006(a) as to the Bradford Receivable No. 2 offset and the September 2000 Select Asset Loan Payments, finding that Comstar received reasonably equivalent value for those payments.  (Docket Entry No. 122 at 19–26).  That holding did not address the Comstar claims under section 24.005(a)(1) on the Bradford Receivable No. 2 offset and the September 2000 Select Asset Loan Payments.

AFFC moves for partial summary judgment on the basis that Smith's remaining claims on behalf of Comstar are time-barred.  (Docket Entry No. 70).  The Comstar offset on the Bradford Receivable No. 2 occurred on June 30, 2000.  (*Id.* at 9).  The $2,513,100 quarterly payments on the Select Asset Loans occurred on September 30, 2000.  (*Id.*).  The

Comstar bankruptcy claim was filed on March 29, 2004.  Smith first alleged that these transactions were fraudulent transfers in the first amended complaint filed on October 10, 2004.  (*Id.*).

Under 11 U.S.C. § 544(b), the bankruptcy trustee steps into the shoes of an unsecured creditor who was in existence when the case was filed and who may avoid the transfer under applicable state law.  Because the trustee steps into the shoes of an actual creditor, the trustee is subject to the debtor's defenses against that creditor.  *In re Grubbs Const. Co.*, 321 B.R. 346, 350 (Bankr. M.D. Fla. 2005); 5 COLLIER ON BANKRUPTCY, ¶ 544.009[3] (15th ed. rev. 2006).  The trustee is subject to both federal bankruptcy-law limitations periods and the state-law limitations periods applicable to fraudulent-avoidance actions.  But there is uncertainty as to how these limitations periods relate to one another.  The TUFTA requires that parties bring fraudulent-transfer claims within four years of the time the transfer was made, or within one year after the fraudulent nature of the transfer was or could have been discovered.[7]  Section 546(a) of the Bankruptcy Code provides in relevant part that "[a]n

---

[7]  Section 24.010 provides:

> [A] cause of action with respect to a fraudulent transfer or obligation under this article is extinguished unless an action is brought:
>
> (1)     Under Section 24.005(a)(1) of this code within four years after the transfer was made or the obligation was incurred or, if later, within one year after the fraudulent nature of the transfer or obligation was or could reasonably have been discovered by the claimant;
>
> (2)     Under Section 24.005(a)(2) or 24.006(a) of this code, within four years after the transfer was made or the obligation was incurred; or
>
> (3)     Under Section 24.006(b) of this code, within one year after the transfer was made.

action proceeding under section 544 . . . of this title may not be commenced after . . . the later of (A) 2 years after the entry of the order for relief" in the bankruptcy court, or "(B) 1 year after the appointment or election of the first trustee under section 702, 1104, 1163, 1202, or 1302 of this title if such appointment or such election occurs before the expiration of the period specified in subparagraph (a)."  11 U.S.C. § 546(a).[8]

AFFC argues that the TUFTA four-year period is a period of repose that is neither extended nor tolled by section 546(a) of the Bankruptcy Code.  The distinction between statutes of limitation and of repose is significant.  While a court may toll a limitations period, a court may not toll a claim that has been extinguished by a statute of repose.  *Amoco Prod. Co. v. Newton Sheep Co.*, 85 F.3d 1464, 1472 (10th Cir. 1996).  A statute of repose presents "an absolute time limit beyond which liability no longer exists and is not tolled for any reason because to do so would upset the economic balance struck by the legislative body."  *First United Methodist Church v. U.S. Gypsum Co.*, 882 F.2d 862, 865–66 (4th Cir. 1989).

---

TEX. BUS. & COM. CODE § 24.010.

[8]  Section 108 provides similar limitations:  "If applicable nonbankruptcy law . . . fixes a period within which the debtor may commence an action, and such period has not expired before the date of the filing of the petition, the trustee may commence such action only before the later of (1) the end of such period, including any suspension of such period occurring on or after the commencement of the case; or (2) two years after the order of relief."  11 U.S.C. § 108.  Section 108 is inapplicable here, however, because that statute applies only to causes of action the debtor could have brought pre-petition.  *In re Downtown Investment Club III*, 89 B.R. 59, 65 (B.A.P. 9th Cir. 1988) ("Bankruptcy Code § 108(a) refers to pre-filing causes of action belonging to the debtor and not to a cause of action created by the Bankruptcy Code.").  When a trustee commences a cause of action under section 544(b) of the Bankruptcy Code, he steps into the shoes of an unsecured creditor rather than those of a debtor.  *In re O.P.M. Leasing Servs., Inc.*, 28 B.R. 740, 760 (Bankr. S.D.N.Y. 1983).  Section 108 involves a trustee's actions brought on behalf of a debtor and does not apply to the facts of this case.  *In re Princeton-New York Investors, Inc.*, 219 B.R. 55, 59 (B.A.P. D.N.J. 1998).

Smith responds that applying an absolute time limit is inconsistent with the Bankruptcy Code policy of providing a trustee enough time to determine what potential claims he may bring to recover estate assets.

The Texas Supreme Court has yet to rule on whether the TUFTA's four-year provision is a statute of repose.  Two Texas appellate courts have held, however, that section 24.010 is a statute of repose.  *Cadle Co. v. Wilson*, 136 S.W.3d 345, 350 (Tex. App.—Austin 2004, no pet.); *Duran v. Henderson*, 71 S.W.3d 833, 838 (Tex. App.—Texarkana 2002, no pet.).  Section 24.010 states that a fraudulent-transfer claim is "extinguished" after four years. TEX. BUS. & COM. CODE § 24.010.  *Cadle* and *Duran* find this language determinative. *Cadle*, 136 S.W.3d at 350 ("Such language indicates that the limitations provision of TUFTA is intended to be strictly construed and that section 24.010 is technically a statute of repose, rather than a statute of limitations."); *Duran*, 71 S.W.3d at 838 (same).  This court agrees.  Section 24.010 of the TUFTA is a statute of repose.

AFFC argues that a bankruptcy trustee has no more rights under section 544(b) than an actual creditor and is subject to the same limitations periods as an actual creditor.  It asserts that the expiration of the statute of repose before Smith filed this lawsuit terminated Smith's remaining claims.  Because Texas courts treat the TUFTA limitations provision as a statute of repose, Smith's remaining claims are time-barred unless the Bankruptcy Code preempts Texas's fraudulent-transfer limitations provision.

Federal preemption analysis begins with "the basic assumption that Congress did not

intend to displace state law." *Maryland v. Louisiana*, 451 U.S. 725, 746 (1981); *see White Buffalo Ventures, LLC v. Univ. of Tex. at Austin*, 420 F.3d 366, 370 (5th Cir. 2005).  The Supreme Court has provided that federal law may preempt state law in three situations:

> First, when acting within constitutional limits, Congress is empowered to pre-empt state law by so stating in express terms. Second, congressional intent to pre-empt state law in a particular area may be inferred where the scheme of federal regulation is sufficiently comprehensive to make reasonable the inference that Congress "left no room" for supplementary state regulation. . . . As a third alternative, in those areas where Congress has not completely displaced state regulation, federal law may nonetheless pre-empt state law to the extent it actually conflicts with federal law. Such a conflict occurs either because "compliance with both federal and state regulations is a physical impossibility," or because the state law stands "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."

*Cal. Fed. Sav. & Loan Ass'n v. Guerra*, 479 U.S. 272, 280–81 (1987) (citations omitted); *see also Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 541 (2001); *La. Health Serv. & Indem. Co. v. Rapides Healthcare Sys.*, 461 F.3d 529, 533 (5th Cir. 2006).  Congress has not expressly preempted state law under section 544(b), and such preemption cannot be inferred. The third ground for preemption is a closer call.  Conflict preemption may arise if either complying with both the state and federal statutes is impossible or if the state law is an obstacle to Congress's intent.  *Guerra*, 479 U.S. at 281; *Rapides Healthcare Sys.*, 461 F.3d at 533–34.  As to the first option, Smith was able to comply with both laws.  Each of the transfers at issue occurred in June and September 2000.  The Comstar bankruptcy claim was filed on March 29, 2004.  The four-year statute of repose would have expired in June 2004

at the earliest, providing Smith several months to assert fraudulent-transfer claims.

Congress clearly intended that trustees would have a reasonable period to determine the viability of various creditor's claims.  The Ninth Circuit has stated that "[t]here can be no doubt that federal bankruptcy law is 'pervasive' and involves a federal interest 'so dominant' as to 'preclude enforcement of state laws on the same subject'—much like many other areas of congressional power listed in Article I, Section 8, of the Constitution, such as patents, copyrights, currency, national defense, and immigration." *Sherwood Partners., Inc. v. Lycos, Inc.*, 394 F.3d 1198, 1201 (9th Cir. 2005).  At the same time, Texas has determined that a fraudulent-transfer action may not be brought more than four years after the transfer. *Cadle Co.*, 136 S.W.3d at 350; *Duran*, 71 S.W.3d at 838.  "Statutes of repose are based on considerations of the economic best interests of the public as a whole and are substantive grants of immunity based on a legislative balance of the respective rights of potential plaintiffs and defendants struck by determining a time limit beyond which liability no longer exists."  *In re Princeton-New York Investors, Inc.*, 219 B.R. 55, 62 (B.A.P. D.N.J. 1998).

Section 546(a) expressly applies only to actions brought under sections 544, 545, 547, 548, or 553.  11 U.S.C. § 546(a).  Without its time extension, a trustee might be unable to assert claims if the state-law limitations period is exceptionally brief.  The Bankruptcy Code uses state fraudulent-transfer law and provides trustees the power to avoid fraudulent transfers.  Section 546(a) is designed to give the trustee "some breathing room" to determine which claims to bring under section 544.  *In re Dry Wall Supply, Inc.*, 111 B.R. 933, 936–37 (D. Colo. 1990).  "This reprieve from the statute of limitations clock is especially important

where the management of a business, in the period immediately prior to bankruptcy, may not have adequate incentives to bring lawsuits in a timely fashion where the recovery is remote in either time or certainty or the prospective benefits would accrue to creditors rather than shareholders." *In re Princeton-New York Investments, Inc.*, 199 B.R. 285, 297 (Bankr. D.N.J. 1996).   The management of IFS, Circle, and Insurance Holdings certainly had little incentive to pursue recovery here, given that Hugo Pimienta allegedly orchestrated many of the transactions for the benefit of some entities and persons and the detriment of IFS creditors.

Several cases discuss the application of section 546(a) to state limitations statutes. *See, e.g.*, *In re Spatz*, 222 B.R. 157, 164 (B.A.P. N.D. Ill. 1998); *In re Martin*, 142 B.R. 260, 265 (Bankr. N.D. Ill. 1992); *In re Topcor, Inc.*, 132 B.R. 119 (Bankr. N.D. Tex. 1991); *In re Dry Wall Supply, Inc.*, 111 B.R. 933 (D. Colo. 1990).   Nearly all hold that if at the beginning of the bankruptcy proceeding, a state fraudulent-transfer claim is viable—because the state statute of limitations has not yet expired—then section 546(a) provides the trustee an additional two years from the time of his appointment to file a fraudulent-transfer action. "Under this analysis, it is immaterial if the limitations period accrues during the pendency of the bankruptcy case." *In re Spatz*, 222 B.R. at 164.   Few cases, however, have dealt with the interplay between section 546(a) and a state statute of repose.   One case found that the expiration of the state period extinguished the trustee's claims.   *In re Phar-Mor, Inc. Secs. Litig.*, 178 B.R. 692 (W.D. Penn. 1995).   Two cases found that section 546(a) preempted the state-law repose periods and allowed the trustees' claims to continue.   *In re Princeton-New*

*York Investors, Inc.*, 199 B.R. at 285; *In re Buildings by Jamie, Inc.*, 230 B.R. 36, 45 (Bankr. D.N.J. 1998).

*In re Phar-Mor* dealt with the application of section 546(a) of the Bankruptcy Code to an Ohio law barring all claims against a decedent's estate that are not presented within one year of the decedent's death. *In re Phar-Mor*, 178 B.R. at 693. The federal district court held that section 546(a) did not preempt the Ohio statute. *Id.* at 696. The court reasoned that probate matters are the states' exclusive concern and the states' interest in regulating probate estates overrides congressional intent to provide a bankruptcy trustee with "breathing room." *Id.* The court also reasoned that because a state repose statute determines an estate's capacity to be sued and the Bankruptcy Code specifically left to state law the determination of an individual's capacity to be sued in adversary proceedings by incorporating Federal Rule of Civil Procedure 17,[9] that the Ohio statute and section 546(a) did not conflict. *Id.*

*In re Phar-Mor* is distinguishable from this case. While probate matters are traditionally left to the states' exclusive control, fraudulent-transfer actions are controlled both by state fraudulent-transfer statutes and the Bankruptcy Code. Section 548 of the Code is a near mirror image of most states' fraudulent-transfer acts. 11 U.S.C. § 548. While the state fraudulent-transfer acts do not encompass fraudulent-transfer claims brought in bankruptcy proceedings, the Bankruptcy Code includes actions brought under both state and federal law and regulates the length of time the trustee has to bring such actions. In probate

---

[9] Bankruptcy Rule 7017 applies Federal Rule of Civil Procedure 17 in adversary proceedings.

matters, there is a clear desire to distribute a decedent's estate expeditiously.  In a state

fraudulent-transfer action brought by a bankruptcy trustee, the debtor's assets are frozen

pending the bankruptcy stay, which allows the trustee time in which to bring claims to

maximize the bankruptcy estate.  *In re Princeton-New York Investments, Inc.*, 219 B.R. 55,

65 (B.A.P. D.N.J. 1998) ("The Court is not convinced that § 25:2-31's status as a statute of

repose,  alone,  is  sufficient  to  establish  an  overriding  state  public  policy  requiring

subordination of the Code's goals for §§ 544(b) and 546(a).").

   State avoidance actions do not present "countervailing state interest[s] which would

outweigh the fulfillment of congressional goals."  *In re Princeton*, 199 B.R. at 297.  In that

case, the court held that section 546(a) preempted the New Jersey repose statute.  On appeal,

the United States District Court for the District of New Jersey upheld the bankruptcy court's

preemption holding, adding: "Section 546(a)'s wording is clear.  It applies to those actions

brought under section 544.  If section 546(a)'s plain meaning has led to unworkable results,

it is for Congress and not the courts to remedy that problem."  *In re Princeton-New York

Investments, Inc.*, 219 B.R. 55, 66 (B.A.P. D.N.J. 1998).

   Under this approach, Smith's claims must have been viable as of the beginning of the

Comstar bankruptcy proceeding on March 29, 2004, under section 24.010 of the TUFTA.

*Cadle Co.*, 136 S.W.3d at 350.  The Bradford Receivable No. 2 offset occurred on June 30,

2000, within the four year period, as did the September 30, 2000 quarterly payments on the

Select Asset Loans.  Under section 546(a) of the Bankruptcy Code, Smith had two years

from March 29, 2004 to bring his fraudulent-transfer claim.  Smith filed these claims on

October 10, 2004.  The Comstar claims are timely.  AFFC's summary judgment motion on these claims is denied; the remainder of the summary judgment motion is moot.

### D.     The Remaining Summary Judgment Motions

Smith's remaining claims consist of section 24.005(a)(1) claims on behalf of Comstar for the $507,561.63 offset on the Comstar Note and the $2,513,100 September 30, 2000 payment on the Select Asset Loans.  AFFC moves for summary judgment on certain affirmative defenses, (Docket Entry No. 78), and on transfers by nondebtors, (Docket Entry No. 75).  Neither of these motions address the remaining claims; these motions are moot.[10]

Smith moves for summary judgment on the following issues: (1) that AFFC is estopped from taking contradictory positions from those asserted in its regulatory filings; (2) that IFS, Circle, and Insurance Holdings, are alter egos and constitute a single business enterprise; and (3) that Comstar was insolvent as of May 23, 2000.  (Docket Entry No. 67).  The first issue concerns the preferred shares redemption of AFFC stock on November 6, 2000 and September 13, 2001.  Smith's claims regarding the redemption transactions have been dismissed.  The estoppel issue does not involve the remaining claims.[11]

The second issue deals with Smith's contention that Circle and Insurance Holdings

---

[10]  The motions to exclude the expert testimony of William E. Avera, (Docket Entry No. 71), and James O. Kelly, III, (Docket Entry No. 74), are also moot.  Their testimony does not address the issues remaining before this court.

[11]  Smith moved to exclude AFFC's experts Hirs and Vollmar and their opinions on estoppel. (Docket Entry 68).  Because the estoppel issue is no longer material in this case, Smith's motion is denied as moot.

are alter egos or part of a single business enterprise with IFS.  He offers testimony from his expert, James P. Smith, in support of this argument.  Again, claims on behalf of IFS, Circle, and Insurance Holdings have been dismissed.  Only selected Comstar claims remain.

The final argument in Smith's second motion for partial summary judgment is that Comstar was insolvent as of May 23, 2000.  (Docket Entry No. 67 at 12).  Smith points to testimony by his expert, James P. Smith, who stated that:

> It is my opinion that IFS and its wholly owned subsidiaries were insolvent as of at least June 30, 2000.  It is also my opinion that Comstar was insolvent as of May 23, 2000 or was rendered insolvent as a result of the note granted as of that date.  Based on my review of the financial records of IFS and my knowledge of its financial transactions, I conclude that the company was not paying its debts as they became due.  I further conclude that following the sale of both of its operating subsidiaries in December 1999 and January 2000, the company did not have the ability to generate operating capital that would ever be sufficient to pay the debts it had incurred.

(Docket Entry No. 67, Ex. R at 5).  Smith also claims that neither of AFFC's experts disagreed with James P. Smith's opinions on insolvency.

Section 24.005(a)(1) of the TUFTA allows a creditor to avoid a transfer that was made "[w]ith actual intent to hinder, delay or defraud any creditor of the debtor."  TEX. BUS. & COM. CODE § 24.005(a)(1).  Smith only has claims under this section remaining.  The issue of insolvency is an element of proof in sections 24.005(a)(2) and 24.006(a), but it is immaterial to Smith's remaining claims under section 24.005(a)(1).  Smith's second motion for partial summary judgment is moot.

### III.    Sanctions

AFFC has moved for sanctions against Smith for allegedly destroying documents pertinent to this litigation in his role as trustee for IFS.  (Docket Entry No. 76).  Federal courts may sanction parties, and their attorneys, using their inherent power to fashion and impose appropriate sanctions for conduct that abuses the judicial process.  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43–46 (1991).  Courts may use their inherent power when the parties' conduct is not controlled by other mechanisms.[12]  *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc.*, 2 F.3d 1397, 1408 (5th Cir. 1993).  Courts may sanction parties and their attorneys when they have practiced fraud on the court.  *Boland Marine & Mfg. Co. v. Rihner*, 41 F.3d 997, 1005 (5th Cir. 1995).  Courts may also sanction parties for destroying or altering relevant evidence, *Pressey v. Patterson*, 898 F.2d 1018, 1023–24 (5th Cir. 1990), and for lying under oath, *Brady v. United States*, 877 F. Supp. 444, 452–53 (D. Ill. 1994).

The primary purpose of sanctions is to deter frivolous litigation and abusive tactics.  *Chambers*, 501 U.S. at 32; *Pavelic & Le Flore v. Marvel Entm't Group*, 493 U.S. 120, 126 (1989).  The sanction imposed must be "the least severe sanction adequate to achieve the purpose of the rule under which it was imposed."  *Chambers*, 501 U.S. at 44; *Scaife v.*

---

[12]  Federal courts may sanction parties and their attorneys under the Federal Rules of Civil Procedure for filing frivolous motions and pleadings (FED. R. CIV. P. 11), filing frivolous or unreasonable discovery requests and responses (FED. R. CIV. P. 26g), failing to participate in pretrial conferences (FED. R. CIV. P. 16(f)), and for refusing to obey discovery orders and make mandatory disclosures (FED. R. CIV. P. 37(b)–(c)). Federal courts may also sanction parties and their attorneys pursuant to federal statutes for contempt of court (18 U.S.C. § 401), and for unreasonably and vexatiously multiplying court proceedings (28 U.S.C. § 1927).

*Associated Air Ctr. Inc.*, 100 F.3d 406, 411 (5th Cir. 1996); *Natural Gas Pipeline Co.*, 2 F.3d at 1406–07.  "When a party's deplorable conduct is not effectively sanctionable pursuant to an existing rule or statute, it is appropriate for a district court to rely on its inherent power to impose sanctions." *Carroll v. Jacques Admiralty Law Firm, P.C.*, 110 F.3d 290, 292 (5th Cir. 1997).

To impose sanctions against a party, a court must make a specific finding that the party acted in bad faith. *Toon v. Wackenhut Corr. Corp.*, 250 F.3d 950, 952 (5th Cir. 2001) (citing *Goldin v. Bartholow*, 166 F.3d 710, 722 (5th  Cir. 1999)).  The court is "to conduct an independent investigation in order to determine whether it has been the victim of fraud." *Chambers*, 501 U.S. at 44.  Courts may make credibility determinations to resolve whether such misconduct has occurred.  *See Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 808–09 (5th Cir. 2003); *Carroll*, 110 F.3d at 293; *In re United Markets Int'l, Inc.*, 24 F.3d 650, 655 (5th Cir. 1994).

"The obligation to preserve evidence arises when the party has notice that the evidence is relevant to litigation or when a party should have known that the evidence may be relevant to future litigation." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 216 (S.D.N.Y. 2003) (quoting *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 436 (2d Cir. 2001)) (additional citations omitted).  Spoliation is defined as "the destruction of evidence, or the significant and meaningful alteration of a document or instrument." *Andrade Garcia v. Columbia Med. Ctr.*, 996 F. Supp. 605, 615 (E.D. Tex. 1998).  If a party with a duty to preserve evidence fails to do so and acts with culpability, a court may impose appropriate

sanctions.  FED. R. CIV. P. 37(c)(1).  A court may also assume facts against a party that destroys or loses evidence subject to a preservation obligation.  *FDIC v. Hurwitz*, 384 F. Supp. 2d 1039, 1099 (S.D. Tex. 2005) (citing *Nation-Wide Check Corp. v. Forest Hills Distribs., Inc.*, 692 F.2d 214, 217–18 (1st Cir. 1982)).  An adverse-inference instruction resulting from spoliation is predicated on the "bad conduct" of the defendant.  *King v. Ill. Cent. R.R.*, 337 F.3d 550, 556 (5th Cir. 2003) (citing *United States v. Wise*, 221 F.3d 140, 156 (5th Cir. 2000)).

AFFC argues that Smith knowingly destroyed over 20,000 boxes of documents belonging to the various debtors months before filing this lawsuit and failed to provide AFFC notice of his intent to destroy the documents.  (Docket Entry No. 49 at 11).  AFFC alleges that the documents contained in the 20,000 boxes that Smith destroyed related to the Select Asset Loans and are necessary to prove the defense that the Select Asset Loans were a fraud set up by Pimienta and that the loan borrowers never actually existed.  AFFC claims that the boxes Smith destroyed contained papers dating from 1998, when the loans were created, and that those papers likely contained relevant information necessary to AFFC's defense.

Smith argues that the document destruction was in good faith and in the regular course of his duties as trustee of the debtors' estates.  (Docket Entry No. 95 at 9).  At most, he states, he was negligent.  By Smith's account, the estate was accumulating large storage fees for these documents and had no money to pay those fees.  Smith stated in his notice of intent to abandon property that

> Iron Mountain [the storage service company] is owed over $20,000 in storage fees for the Records dating back many years to the late 1990's.  The expenses of storage continue to mount.  Trustee is unable to pay that which relates to Records of IFS, much less the other persons and/or entities involved.  It is unjust for Iron Mountain to continue to hold the Records without some assurances of payment, which Trustee is unable to give.  With the assistance of Iron Mountain, Trustee reviewed approximately 65 boxes of Records from various Iron Mountain locations.  That review indicated that the Records appeared to cover the period 1990 through 1997–1998 and were not necessary to Trustee's administration of the Estate.

(Docket Entry No. 76, Ex. E).  Smith also testified that the documents in the destroyed boxes "were largely irrelevant to the administration of my estate. . . . [They] pertain[ed] primarily to personnel, procedures, advertising, and that kind of stuff.  There was just nothing meaty in there at all. . . . We knew that there were other places where the meat had been placed." (Docket Entry No. 76, Ex. C at 177–78).  Smith asserts that he provided notice of his intent to abandon these documents to all the parties that had requested to receive such notice. AFFC was given the opportunity to receive such notice, but declined to do so, according to Smith.  No parties who received Smith's notice of intent to abandon the property objected to his proposed action.

A trustee's ability to abandon property of the estate is governed by 11 U.S.C. § 554(a), which states that "[a]fter notice and a hearing, the trustee may abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate."  11 U.S.C. § 554(a).  Federal Rule of Bankruptcy Procedure 6007 provides the procedure for abandonment: any party in interest may file and serve an

objection to the abandonment within 15 days of the mailing of the notice. FED. R. BANKR. P. 6007. If there is no objection to the proposed abandonment after notice, the court may allow abandonment without a hearing. *Id.* Courts that have decided the issue have found that trustees who follow the procedures outlined in section 554(a) and Rule 6007 are not subject to sanction. *See In re Bouldin*, 196 B.R. 202, 210 (Bankr. N.D. Ga. 1996) (holding that property was properly abandoned by giving notice of intent to abandon to creditors and no objections were lodged); *In re S. Int'l Co., L.P.*, 165 B.R. 815, 821 (Bankr. E.D. Va. 1994) (finding Rule 6007 requirements satisfied by notice of a creditors' meeting in which the trustee stated that he "may give notice of his intention to abandon property that is burdensome or of inconsequential value" at the creditors' meeting); *cf. Sierra Switchboard Co. v. Westinghouse Elec. Corp.*, 789 F.2d 705, 709–10 (9th Cir. 1986) (affirming the district court's holding that no abandonment occurred when the trustee failed to give creditors notice of his intent to abandon the debtor's emotional distress claim under Rule 6007's procedures; the claim remained the property of the bankruptcy estate).

AFFC has not presented evidence showing that Smith failed to follow proper procedures in abandoning the 20,000 boxes of documents. Smith claims that AFFC could have received notice of his intention to abandon the documents, but chose not to. Smith followed Bankruptcy Code procedure by providing notice to all interested creditors. He received no objections at the time. The record does not establish bad faith as necessary to

impose the sanctions AFFC seeks.  AFFC's motion for sanctions is denied.[13]

---

[13]  AFFC also moves for the exclusion of the IFS Group's business records, claiming that Smith's organization and upkeep of these documents has been so disorderly that a proper foundation to their authenticity cannot be made.  (Docket Entry No. 76 at 14).  Smith points out that the parties have stipulated to the admissibility of many of these documents and that several custodians of record have entered affidavits of authenticity for many of the others.  (Docket Entry No. 95, Ex. F).  Smith also attests that Stephanie Sawyer and Gerald Simpson, who have been identified in Smith's Rule 26 disclosures as persons with knowledge of relevant facts, can provide live testimony to lay the proper foundation to the authenticity of these documents if necessary.  (Docket Entry No. 95, Ex. G).  This court declines to rule on the wholesale admissibility of hundreds of boxes of documents based on their disorganization.  AFFC's motion to exclude business records is denied.

**IV.     Conclusion**

AFFC's motion for partial summary judgment that Smith lacks standing to bring this suit is granted; AFFC's motion for partial summary judgment on statutes of repose is denied; AFFC's motion for summary judgment on certain affirmative defenses is moot; AFFC's motion for partial summary judgment on transfers by nondebtors is moot; the motions to exclude expert testimony are moot; Smith's second motion for partial summary judgment is moot; AFFC's motion for leave to file motions greater than 25 pages in length is granted; and AFFC's motion for sanctions is denied.

A scheduling conference to resolve the remaining claims is set for April 6, 2007, at 1:00 p.m.

SIGNED on March 10, 2007, at Houston, Texas.

Lee H. Rosenthal
United States District Judge